**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SECURITIES AND EXCHANGE
COMMISSION,

      *Plaintiff,*

v.

PAUL A. BILZERIAN, *et al.*,

      *Defendants.*

Case No. 1:89-cv-1854-RCL

<u>**MEMORANDUM OPINION**</u>

      In 2001, this Court enjoined defendant Paul Bilzerian and his associates from commencing or causing the commencement of any legal proceedings in any Court other than this Court or the D.C. Circuit unless he first receives permission to do so from this Court. Bilzerian has since renounced his American citizenship and taken up residence in St. Kitts and Nevis. Intervenor Kevin Horstwood, also a resident of St. Kitts, alleges that Bilzerian, operating under the guise of his son Adam and various corporate entities, has violated the injunction by instigating legal proceedings against Horstwood in the Eastern Caribbean Supreme Court, which has jurisdiction over St. Kitts & Nevis. The Court ordered Bilzerian to show cause in writing as to why he should not be held in contempt. In response, Bilzerian argues first that the injunction cannot reach disputes in foreign courts between foreign nationals; second, that the Court should exercise its discretion to relieve Bilzerian of the injunction; third, that the Court should reconsider its Order permitting Horstwood to intervene; and fourth, that in any event Horstwood has not demonstrated that Bilzerian has violated the injunction.

      None of Bilzerian's attacks on the injunction itself are meritorious. Moreover, Horstwood's Motion for an Order to Show Cause and its accompanying exhibits provide clear and

convincing evidence that Bilzerian has indeed failed to comply with the injunction by causing the commencement of legal proceedings against Horstwood. Therefore, and for the reasons explained herein, the Court will find Bilzerian in civil contempt of this Court's injunction and order him to withdraw any and all lawsuits against Horstwood, his attorneys, and any businesses that Horstwood purports to own. Those lawsuits may be refiled, if at all, only with leave of this Court.

## I.    Background

In 1989, a jury in the Southern District of New York convicted Bilzerian of various financial crimes including securities fraud, making false statements to the Securities and Exchange Commission ("SEC"), and conspiracy to defraud the Internal Revenue Service ("IRS") and SEC. *See United States v. Bilzerian*, 926 F.2d 1285, 1289 (2d Cir. 1991). For those convictions, he was initially sentenced to four years' imprisonment[1] and a fine of $1.5 million. *Id.* Bilzerian's entanglement with this Court began shortly after his conviction, when the SEC filed a 74-page civil complaint against him. *See generally* Compl., ECF No. 1. Judge Stanley S. Harris ultimately ordered Bilzerian to disgorge the unlawfully obtained proceeds of his actions, to the tune of a further $62 million. *See SEC v. Bilzerian*, 814 F. Supp. 116, 124 (D.D.C. 1993); *SEC v. Bilzerian*, No. 89-cv-1854-SSH, 1993 WL 542584, at *1 (D.D.C. June 25, 1993); *SEC v. Bilzerian*, 127 F. Supp. 2d 232, 232 (D.D.C. 2000). Several years later, Bilzerian had still failed to satisfy this judgment, leading Judge Harris in 2000 to hold him in contempt and appoint a receiver to collect and liquidate his assets in order to pay off his judgment debts. *See SEC v. Bilzerian*, 112 F. Supp. 2d 12 (D.D.C. 2000) (holding Bilzerian in contempt); *SEC v. Bilzerian*, 127 F. Supp. 2d at 232 (appointing a receiver).

---

[1] Bilzerian's prison sentence was later reduced to 20 months. *SEC v. Bilzerian*, 613 F. Supp. 2d 66, 68 (D.D.C. 2009).

In the months that followed, Bilzerian initiated an unrelenting campaign of vexatious and frivolous litigation in various courts calculated to forestall and frustrate the receiver's efforts to process his assets. *SEC v. Bilzerian*, 815 F. Supp. 2d 324, 325–26 (D.D.C. 2011). In response, in July 2001, this Court issued an injunction that provides as follows:

> Defendant Paul A. Bilzerian, his agents, servants, employees, attorneys, and those persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, are prohibited from filing or causing the filing of any complaint, proceeding or motion in the United States Bankruptcy Court for the Middle District of Florida, or from otherwise commencing or causing the commencement of proceedings in any court, other than in this Court or in appeals of this Court's Orders to the United States Court of Appeals for the District of Columbia, without prior application to and approval of this Court . . . .

Order of July 19, 2001, ECF No. 416 (the "2001 injunction"). The U.S. Court of Appeals for the District of Columbia Circuit affirmed that injunction on appeal. *See SEC v. Bilzerian*, 75 Fed. App'x 3 (D.C. Cir. 2003). Moreover, in 2009, this Court held Bilzerian, his then-associate David Hammer, and certain corporate entities affiliated with Bilzerian in civil contempt of the 2001 injunction. *SEC v. Bilzerian*, 613 F. Supp. 2d 66 (D.D.C. 2009). On appeal, the D.C. Circuit affirmed this Court's judgment of contempt. *SEC v. Bilzerian*, 410 Fed. App'x 346 (D.C. Cir. 2010). Then in 2017, Bilzerian asked this Court for relief from the 2001 injunction, *see* Motion for Relief from Judgment, ECF No. 1215, which this Court denied, *see* Order of March 27, 2018, ECF No. 1219. That denial of reconsideration was then affirmed by the D.C. Circuit. *See SEC v. Bilzerian*, 811 Fed. App'x 3 (D.C. Cir. 2020).

Having now survived appeal three times—at its issuance, upon enforcement, and after denial of a motion for reconsideration—there remains no doubt that the 2001 injunction is a lawful exercise of this Court's equitable authority. But the unusual factual circumstances of this dispute, detailed in the following section, raise novel challenges about the scope of the injunction and this Court's ability to enforce it in a foreign jurisdiction through its contempt powers.

## II.     Horstwood's Allegations

Over the course of more than 90 pages of narrative and more than 700 pages of exhibits, consisting mostly of court documents and email correspondence between Horstwood and Bilzerian, Horstwood's Motion for an Order to Show Cause, ECF No. 1248, spins a sordid tale of financial villainy, intrigue, extortion, and even murder.   Bilzerian wholeheartedly denies Horstwood's account, contending that Horstwood is nothing more than a delinquent debtor who borrowed irresponsibly and has now concocted a fictional story to turn the Court against Bilzerian and thus evade accountability for his contractual defaults.   Bilzerian does not, however, dispute the veracity of Horstwood's exhibits themselves, which the Court may therefore treat as conceded for purposes of these proceedings. *See Harris v. City of Phila.*, 47 F.3d 1333, 1340 (3d Cir. 1995) ("Because the relevant facts are undisputed, the only question remaining is whether those facts justified a finding of contempt.   In such a case, no evidentiary hearing is necessary.") (citing *Alexander v. Chi. Park Dist.*, 927 F.2d 1014, 1025 (7th Cir. 1991)); *In re Roth*, 935 F.3d 1270, 1728 (11th Cir. 2019) ("In civil contempt proceedings, when there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt . . . .") (quotations omitted).

Most of the conduct alleged in Horstwood's Motion, however salacious it may be, has no relevance to the 2001 injunction.   The sole factual inquiry for the Court in these contempt proceedings is whether Bilzerian instigated litigation in a court other than this one without this Court's permission.   Therefore, the Court will not reach any conclusions about the overall truthfulness of Horstwood's or Bilzerian's account.   Nevertheless, to adequately contextualize the Court's findings of fact related to Horstwood's contempt allegations, the Court will present a

greatly distilled summary of events as they are alleged in Horstwood's Motion.[2]  If a fact stated herein is accompanied by a citation to a specific exhibit from Horstwood's Motion, that indicates that the Court has found it to be both relevant to the contempt determination and proven by clear and convincing evidence.

Horstwood, an English architect, moved to St. Kitts in 2004 and started a business called Caribbean Building Systems ("CBS").  Mot. for Order to Show Cause at 3.  He purchased a hotel and restaurant property known as the Rawlins Plantation Inn ("Rawlins").  *Id.*  In 2008, wishing to expand his business, he sought to purchase the nearby Golden Lemon Inn & Villas ("Golden Lemon").  He put down a deposit of roughly $1.1 million, and hired an attorney, Vernon Veira, to assist in closing the transaction.  *Id.* at 3–4.  The Golden Lemon deal was set to close on April 1, 2009.  Veira was supposed to appear at the closing with a check for approximately $3 million drawn on Horstwood's client trust account.  But Veira never showed up, and Horstwood was subsequently unable to reach him.  *Id.*

The next day, Bilzerian, then a stranger to Horstwood, called and introduced himself as a friend of Veira's and as the president of International Investors Group, Inc. ("IIG").  *Id.* at 4.  He informed Horstwood that Veira had "misappropriated" all the money in Horstwood's client trust account but promised that IIG would "refinance" Veira so that he could repay his creditors.  *Id.* at 4.  Bilzerian further assured Horstwood that he would also assist in the closure of the Golden Lemon deal, so long as Horstwood did not alert the authorities about Veira's misconduct.  *Id.* at 4–5.

---

[2] Because the email exchanges affixed to Horstwood's Motion are so voluminous, summarizing their contents would make for an unreasonably long and rambling factual exposition.  *See generally* Mot. for Order to Show Cause 572–824.  It suffices to say that these emails, taken as a whole, corroborate Horstwood's claims that Paul Bilzerian, rather than his son Adam, played the leading role in the financial dealings at the core of the St. Kitts litigation.

Bilzerian then concocted a scheme whereby Veira's assets would be put into a trust, of which Bilzerian would be the trustee; Bilzerian would then "liquidate or leverage" those assets to obtain sufficient liquidity for Horstwood's acquisition of the Golden Lemon. *Id.* at 6. However, Bilzerian's company, IIG, was unwilling to lend money solely against Veira's assets, and asked Horstwood to sign a personal guarantee for the proposed loan. *Id.* at 7. Horstwood did not wish to sign such a guarantee, so instead he made a renewed offer to purchase the Golden Lemon: Horstwood would pay an additional $350,000 in addition to the money he had already paid, and Horstwood's company CBS would take on roughly $4 million in mortgage debt to the Golden Lemon's bank, and in return Horstwood would become the sole equity holder in the Golden Lemon. *Id.* at 8. However, after the loss of the funds in his client trust account, Horstwood did not have the $350,000 that would be required to close this deal. Bilzerian, knowing of Horstwood's financial distress, offered to make him a loan to cover the shortfall. *Id.* at 8. On December 2, 2009, Horstwood executed the deal to acquire the Golden Lemon, anticipating the forthcoming loan from Bilzerian. *Id.* at 8–10.

Horstwood was surprised when, about one week later, another of Bilzerian's companies, International Investments Ltd. ("IIL")[3], sent him the loan terms: a 100% per annum interest rate, a 200% per annum penalty interest rate, and a blanket security interest in Horstwood's companies as collateral in case of default. *Id.* at 10. Bilzerian verbally assured Horstwood that these were IIL's standard terms and promised that he would never actually foreclose on Horstwood's companies. *Id.* at 10. Faced with the Hobson's choice of either agreeing to this loan or defaulting on the Golden Lemon deal (and thus forfeiting the money he had already paid as a deposit), and in

---

[3] It should be noted that Veira, Bilzerian's "friend" who disappeared with Horstwood's client trust account, was one of IIL's directors. *See* Memorandum to Registrar of Companies, Mot. for Order to Show Cause ex. KAH E-25, at 683.

reliance on Bilzerian's representations, Horstwood accepted.  *Id.* at 10, 12.  To make matters worse, Horstwood claims he later discovered that Bilzerian had unlawfully appropriated and laundered the $350,000 in funds that were lent to him.  *Id.* at 16.[4]

From this point on, Horstwood indicates that he felt as though Bilzerian was holding him hostage—he was locked into a deal for which his own funds were inadequate, and he was entirely dependent on Bilzerian's promise of financing.  *Id.* at 13.  Bilzerian wielded this power over Horstwood to extract various concessions.  For example, in January 2010, Bilzerian forced Horstwood to sign a set of replacement loan documents that named "ABilzerian" (referring to Adam Bilzerian, Paul's son) as the lender, instead of Bilzerian's firm IIL.  *Id.* at 14–15.

Horstwood intended to pay back Bilzerian's loan as soon as possible, but lacked the requisite cash, so he attempted to sell some of the villa properties that he had acquired as part of the Golden Lemon deal.  *Id.* at 16.  But Bilzerian allegedly preferred that Horstwood default on the loan so that Bilzerian could instead take over Horstwood's business interests.  So, Bilzerian demanded extensive information about each potential villa buyer, spoke to them behind Horstwood's back, and subjected each potential sale to intense scrutiny, in an insidious campaign to undermine the villa transactions.  *Id.* at 18.  Bilzerian's intensive badgering of Horstwood and the prospective buyers succeeded in frustrating the villa sales, and impaired Horstwood's ability to fulfill his duties to his clients.

The loan came due in January 2011, and Horstwood was unable to pay.  *Id.* at 18.  Bilzerian summoned Horstwood to his condominium to force him to sign a forbearance agreement, which offered Horstwood additional time to pay back the loan but would saddle him with even more

---

[4] An audit report compiled by Deloitte suggests that Bilzerian and IIL were the beneficiaries of unauthorized payments from Carpathian Resources Limited, a then-publicly-traded Australian corporation.  *See generally* Deloitte Report, Mot. for Order to Show Cause ex. KAH E-23, at 662.

oppressive terms. *Id.* at 18–19, 21. Horstwood refused to sign it on the spot, instead asking Bilzerian to send the agreement to Nigel Calvert, Horstwood's lawyer in London. *Id.* at 19. Bilzerian became agitated and threatened that if Horstwood did not sign, he would foreclose on Horstwood's shares and take his companies. *Id.* Horstwood ran out of the room without signing. *Id.* He sought out advice from certain prominent locals who patronized his businesses, including Ambassador Wendel Lawrence and the Prime Minister of St. Kitts; the latter agreed to speak with Bilzerian on Horstwood's behalf, and even mediated a meeting between them later that month. *Id.* at 19, 22.

Nevertheless, Bilzerian continued to hound Horstwood with menacing calls and emails. Bilzerian threatened him with foreclosure and worse, saying: "[Y]ou don't realize how rich and powerful my friends are, we can get rid of you Kevin anytime that we want to[.]" *Id.* at 21. Horstwood gave in and signed the forbearance agreement. *Id.* at 21–22. Even after the agreement was signed, Bilzerian continued tampering with the villa sales. This, coupled with complications with the banks involved in the villa sales, forced Horstwood to sign yet another draconian forbearance agreement a few months later. *Id.* at 28–29. He would eventually acquiesce to a third one in June 2011, and a fourth in July. *Id.* at 35, 47.[5]

In May 2011, Horstwood became hopeful that he would reach a villa deal with a Trinidadian businessman called Rolph Hive and a Kittitian developer named Sebastian Mottram. *Id.* at 29, 35. Mottram "unexplainably" withdrew from the deal in June before it could come to fruition. *Id.* at 39. Horstwood met with Hive later that month to discuss the potential deal, during

---

[5] In pressuring Horstwood to sign the third forbearance agreement, Bilzerian remarked that his son, Dan Bilzerian, "has a large gun collection" and that he "[couldn't] imagine why anyone would be without a gun on St. Kitts." Mot. for Order to Show Cause at 34–35. Horstwood attests that Bilzerian's repeated allusions to his son's collection of weaponry and military experience were insinuations that Dan would kill Horstwood if he failed to comply, and effectively intimidated him into signing.

which Bilzerian sent Horstwood impatient messages demanding an update on the prospective deal. *Id.* at 41. Horstwood told Hive the entire story. Hive advised Horstwood that Bilzerian was "railroading" him and told him not to respond to Bilzerian's messages, so Horstwood sent Bilzerian only a short and vague reply. *Id.* at 41–42. Bilzerian responded that if Horstwood did not contact him right away, he would "have no choice to proceed in another direction." *Id.* at 42.

This was not an empty threat: The next day, Horstwood received a demand letter from "adambilzerian@gmail.com" for nearly $1.8 million, the amount supposedly owed on Horstwood's loans. *Id.* Horstwood believes that Paul Bilzerian was in fact behind this demand letter and the ensuing email exchanges, despite the email account's name suggesting that it belongs to Adam Bilzerian. *Id.* at 42–43. In August 2011, after further meddling by Paul Bilzerian, Hive dropped out of the deal. *Id.* at 49.

Later that month, Paul Bilzerian called Horstwood to his condo and presented him with a document that would transfer ownership of Horstwood's companies to Adam Bilzerian. *Id.* at 50. Bilzerian once again peppered Horstwood with insults and threats until, fearing for his personal safety, Horstwood signed the document. *Id.* at 51.

In October 2011, Bilzerian began asking Horstwood to provide him with a set of keys for the Golden Lemon Inn. *Id.* at 52. Horstwood was determined not to let Bilzerian take over, so he made up excuses to avoid handing over the keys, and simultaneously began strategizing with his English attorney Calvert about mounting a legal opposition to Bilzerian. *Id.* at 53. Bilzerian became frustrated with Horstwood, threatening that if Horstwood did not become more responsive to his requests, he would "assume you no longer wish to communicate with me and advise Adam to act accordingly." Email of Oct. 20, 2011, Mot. for Order to Show Cause ex. KAH E-80, at 824.

When the owner of "adambilzerian@gmail.com" discovered that Horstwood was in communication with Calvert, he sent Calvert an email asserting that Adam Bilzerian was now the owner of Horstwood's companies, pursuant to the document that Horstwood had signed in August. Mot. for Order to Show Cause at 54. With Calvert's advice, Horstwood sent a cease-and-desist letter to Adam Bilzerian, requesting that he refrain from asserting that he owned the companies. *Id.*

In November 2011, a lawsuit (the "2011 suit") was filed in the Eastern Caribbean Supreme Court, with Adam Bilzerian as nominal claimant and Horstwood as defendant, which sought to establish Adam Bilzerian as the owner of the companies. *Id.* at 55. Horstwood contends that Paul Bilzerian was the driving force behind the 2011 suit. In 2015, Adam Bilzerian would eventually file a Power of Attorney appointing Paul Bilzerian as his attorney-in-fact in the 2011 suit and in other litigation. *See* 2015 Power of Attorney, Mot. for Order to Show Cause ex. KAH C-4, at 112. Paul Bilzerian effectively took control of this litigation, filing applications and affidavits with the Court and appealing adverse decisions on his son's behalf. *See, e.g.*, Aff. in Support of Request for Written Decision, Mot. for Order to Show Cause ex. KAH C-5, at 116.

In December 2011, Horstwood's relationship with Bilzerian, and his fortunes, took a dramatic turn for the worse. Shortly after Horstwood's initial appearance in the 2011 suit, and evidently upset by Horstwood's intention to defend his claim to the companies, Bilzerian visited the Golden Lemon, along with Adam and his wife, Terri. There, Paul Bilzerian threatened Horstwood, then began throwing punches at him, one of which struck Horstwood in the lip. *Id.* at 55. After Bilzerian returned to the car, Adam apologized to Hortswood, and admitted that he had no interest in the Golden Lemon—that, indeed, the entire thing had been orchestrated by his father to develop the property. *Id.* Horstwood responded that he knew about the illicit provenance of

the funds Bilzerian had lent him in Adam's name. *Id.* at 56. Adam appeared surprised and quickly left. After he had gone, Mathew Murphy, one of Horstwood's staff who had witnessed the altercation, advised Horstwood to call the police, and said that he would corroborate Horstwood's account. *Id.*

Horstwood did, indeed, call the police. *Id.* at 57. But then, a few days later, Murphy was found murdered in a cane field. *Id.* The next day, Horstwood went to the police office to make a statement, convinced that Bilzerian was responsible for Murphy's murder. *Id.* at 57–60. However, while Horstwood was giving his account, the inspector with whom Horstwood was speaking received two mysterious phone calls; his demeanor changed abruptly, and he began questioning Horstwood. *Id.* at 60–61. Much to Horstwood's surprise, he was immediately arrested and incarcerated in connection with Murphy's murder. *Id.* at 61. Horstwood believes that Bilzerian used his political connections to frame him.

In January 2012, with Horstwood indisposed, Bilzerian moved for summary judgment in the 2011 suit, seeking the entirety of Horstwood's equity in his companies. *Id.* at 62. Horstwood claims that, due to allegedly deficient service of the motion and an utter lack of cooperation from the prison officials, he was unable to file an affidavit in his defense. *Id.* at 63. In March 2012, summary judgment was entered against Horstwood in his absence, of which he was not notified until much later. *Id.* at 65–66.

Horstwood was incarcerated for nearly four years without trial. *Id.* at 66. Finally, after a change of government in St. Kitts, the new Director of Public Prosecutions reviewed Horstwood's file and concluded that there was no evidentiary basis upon which to prosecute Horstwood for the Murphy murder. *Id.* at 66. Horstwood was finally released in November 2015. *Id.* at 67.

After his incarceration, Horstwood continued to seek legal assistance to fight back against Bilzerian's efforts to take over his companies.  In March 2017, after several years of litigation and with the assistance of an attorney named Terrence V. Byron, Horstwood finally succeeded in having the summary judgment against him in the 2011 suit set aside.  *Id.* at 72.

As a result, another lawsuit in Adam Bilzerian's name (the "2017 suit") was filed in the same court the following week against Byron, his law firm, and Horstwood, alleging that Byron's participation in Horstwood's case was improper.  *Id.* at 73.  Another Power of Attorney was filed almost immediately, under which Bilzerian proceeded to prosecute this claim himself, appearing in person at each hearing as Adam Bilzerian's attorney, and drafting and filing motions and affidavits bearing his own signature.  *Id.* at 73; *see* 2017 Power of Attorney, Mot. for Order to Show Cause ex. KAH C-9, at 140; Order of Aug. 14, 2017, Mot. for Order to Show Cause ex. KAH C-8, at 135 (noting Bilzerian's appearance "by virtue of power of attorney for Adam Bilzerian").  Also named as claimants in the 2017 suit are Horstwood's companies, which Adam Bilzerian still purported to own pursuant to the August 2011 agreement that Horstwood had signed, and which Bilzerian purported to represent.  *See* Order of Feb. 28, 2019, Mot. for Order to Show Cause ex. KAH C-10, at 145 (noting Paul Bilzerian as representative for all three claimants).

Bilzerian's conduct in the 2017 suit is familiar to this Court: he moved multiple times for recusal of the judge, leading the judge to chide him for his many frivolous motions, which were seemingly designed for the sole purpose of prolonging the litigation.  Mot. for Order to Show Cause at 76–77; *see generally* Judgment of July 25, 2019, Mot. for Order to Show Cause ex. KAH C-18, at 263–89.  In May 2023, Bilzerian amended his claim in the 2017 suit, removing Adam and CBS as claimants and Horstwood as defendant, leaving a dispute between only himself (in his capacity as a director of the Lemon Grove company), Byron, and Byron's law firm.  Mot. for Order

to Show Cause at 81; Amended Claim Form, Mot. for Order to Show Cause ex. KAH C-25, at 361–368.

Additionally, in 2016, Bilzerian had filed another lawsuit (the "2016 suit") in the same court on Adam Bilzerian's behalf against Horstwood, this one a breach of contract action seeking $10 million in damages. *Id.* at 81–82. In that case as well, Bilzerian is listed as "appearing for Adam Bilzerian in person," pursuant to his power of attorney. *Id.* at 82–83. The judge in that case offered this rather telling reflection:

> "Then there is the question as to what role Paul Bilzerian has played in all of the events. Can he continue to hide behind the cloak or take shelter from the fact that he is not named as a party to these proceedings? Should Paul Bilzerian for the purpose of these proceedings, be regarded a 'party' by virtue of the definition of 'party' given by [Civil Procedure Rules] 2.4? If not, should he be made a party to these proceedings?"

Judgment, Mot. for Order to Show Cause ex. KAH C-27, at 381. In the 2016 suit, Bilzerian also moved to substitute Bilzerian's company, IIL, as the claimant instead of Adam Bilzerian. Mot. for Order to Show Cause at 89–90. Horstwood objected to this substitution, arguing that allowing the case to proceed in the name of Bilzerian's company would be in violation of the 2001 injunction. *Id.* at 89. In Bilzerian's response, he argued first that the 2001 injunction is unenforceable outside of the United States, and second that it is irrelevant because Bilzerian was not a named party to the suit. *See* Bilzerian's Affidavit in Response, Mot. for Order to Show Cause ex. KAH C-39, at 556. The judge granted the request to swap claimants but did not explicitly engage with either party's arguments about the applicability of the 2001 injunction, reasoning only that the request satisfied the requirements of the court's Civil Procedure Rules. *See* Order of June 23, 2023, Mot. for Order to Show Cause ex. KAH C-40, at 561.

Horstwood submitted a paper copy of his Motion for an Order to Show Cause to this Court in July 2023, contending that Bilzerian violated the 2001 injunction by filing the three

aforementioned lawsuits against him.  The Court instructed him that he first needed to file a Motion for Post-Judgment Intervention, which he did in April 2024.  ECF No. 1240.  That Motion was granted, *see* Order of June 18, 2024, ECF No. 1247, and his Motion for an Order to Show Cause was subsequently added to the docket.  Bilzerian filed a Motion to Strike, ECF No. 1249.  The Court simultaneously denied Bilzerian's Motion and granted Horstwood's Motion in September 2024, ordering Bilzerian to show cause in writing why he should not be held in contempt of the 2001 injunction.  *See* Order of Sept. 20, 2024, ECF No. 1251.  Bilzerian filed his response in October, in which he argues: 1) that the 2001 injunction does not apply to foreign disputes between foreign nationals; 2) that the Court should dissolve the 2001 injunction; 3) that the Court should reconsider its order permitting Horstwood to intervene; and 4) that, in any event, he did not cause the commencement of legal proceedings in violation of the 2001 injunction.  See Response to Order to Show Cause, ECF No. 1252.  Bilzerian's response is now ripe for this Court's review.

## III.    Legal Standards

### A.  Contempt

The power to punish parties for contempt is inherent in all courts, and its existence is essential to a court's ability to enforce judgments and orders. *Broderick v. Donaldson,* 437 F.3d 1226, 1234 (D.C. Cir. 2006) (quoting *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1874)).

Civil contempt is designed to coerce compliance with a court order or to compensate a complainant for losses sustained. *In re Fannie Mae Secs. Litig.,* 552 F.3d 814, 823 (D.C. Cir. 2009). Civil contempt "will lie only if the putative contemnor has violated an order that is clear and unambiguous, and the violation must be proved by clear and convincing evidence." *Broderick,* 437 F.3d at 1234 (quotation omitted).  Clear and convincing evidence in the context of civil

contempt means "a quantum of proof adequate to demonstrate to a 'reasonable certainty' that a violation has occurred." *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 250 (2d Cir. 2002).[6]

### B.  Motion to Modify or Dissolve an Injunction

As part and parcel of its inherent equitable powers, and pursuant to Federal Rule of Civil Procedure 60(b), a court "may relieve a party . . . from a final judgment, order, or proceeding" either because "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; [] applying it prospectively is no longer equitable; or . . . any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(5)–(6); *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions . . . .").  "[W]hether because of subsequent legislation, a change in the decisional law, or a change in the operative facts," Charles A. Wright & Arthur R. Miller, 11 Fed. Prac. & Proc. Civ. § 2863 (3d ed. 2024), the Court may decide that continued enforcement of an injunction would be "detrimental to the public interest" and modify it accordingly.  *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (2009)).  The party seeking relief from an injunction bears the initial burden "of establishing that changed circumstances warrant relief . . . ."  *Id.* (citing *Rufo*, 502 U.S. at 383).

---

[6] The purpose of criminal contempt, on the other hand, is "punitive, to vindicate the authority of the court."  *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911).  Criminal contempt is also "a crime in the ordinary sense . . . ." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968).  Therefore, a party subject to criminal contempt proceedings is entitled to the full scope of constitutional protections ordinarily afforded in a criminal case, including the right to proof beyond a reasonable doubt and, if faced with the possibility of imprisonment exceeding six months, a trial by jury.  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–27 (1994) (collecting cases).  This Opinion contemplates only whether Bilzerian is in civil contempt of the 2001 injunction.

### C. Motion for Reconsideration

"[D]istrict courts retain 'broad discretion to grant or deny a motion for reconsideration,'" and will grant such a motion if, in their discretion, they find "that 'justice [so] requires.'" *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005) (Lamberth, J.) (first quoting *Cobell v. Norton*, 226 F. Supp. 2d 175, 177 (D.D.C. 2002), then quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)).  However, "[m]otions for reconsideration are disfavored," *Wright v. FBI*, 598 F. Supp. 2d 76, 77 (D.D.C. 2009) (quotations omitted), and in the interest of judicial efficiency and finality, they generally "may not be used to 'relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *2910 Ga. Ave. LLC v. Dist. of Columbia*, 59 F. Supp. 3d 48, 49 (D.D.C. 2014) (quoting *Jung v. Ass'n of Am. Med. Colls.*, 226 F.R.D. 7, 9 (D.D.C. 2005)).  "[T]he moving party has the burden to demonstrate 'that reconsideration is appropriate.'" *United States v. All Assets Held at Bank Julius*, 502 F. Supp. 3d 91, 95 (D.D.C. 2020) (quoting *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017)).  Some circumstances in which reconsideration may be warranted include where the Court has "patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court." *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quoting *Cobell*, 224 F.R.D. at 272).

## IV.    The Court Has Jurisdiction to Enforce Its Injunction

Bilzerian's Response to the Order to Show Cause contends that the 2001 injunction must be understood to apply only to "any court *in the United States* . . . ." Def.'s Opp'n at 2 (emphasis added).  That is, of course, not what the Order says.  The 2001 injunction contains no language— and Bilzerian identifies none—that could possibly be construed to limit its territorial scope to the

United States; to the contrary, by its express terms, it requires Bilzerian to refrain from commencing proceedings "in *any* court" without first securing this Court's approval.  Order of July 19, 2001 (emphasis added).[7]  But Bilzerian takes the position that a literal reading of the injunction, which would require him to seek permission prior to commencing legal proceedings in "any court on planet earth," would be "too broad, especially when applied to a foreign citizen bringing an action against another foreign citizen in a foreign court that has no connection to the parties in the underlying case or to any citizen or agency of the United States."  *Id.*  Giving Bilzerian the benefit of the doubt, the Court interprets this as a legal challenge either to the Court's *authority* to issue an injunction impairing his ability to litigate in foreign forums, or to the Court's jurisdiction to *enforce* its injunction under the circumstances of the case, rather than merely registering a grievance about the breadth of the Order.  Nevertheless, these arguments are unpersuasive.

Since at least the 19th century and up to the present day, American courts have recognized their own power to issue an injunction that is effective outside of the court's own territorial jurisdiction, so long as the party to be enjoined is properly before the court and the injunction does not unduly impinge on a foreign jurisdiction's sovereignty.  *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) ("Where . . . there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it

---

[7] Bilzerian does not explicitly invoke the "presumption against extraterritorial application," but the Court nevertheless feels compelled to explain why, even if he had done so, it would make no difference.  The presumption against extraterritoriality operates as a "canon of *statutory* interpretation . . . ."  *Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 115 (2013) (emphasis added).  Here, the Court is not interpreting an act of Congress, but rather its own order.  "Trial courts are in the best position to interpret their own orders and are entitled to inherent deference when they construe those orders."  *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 42, 49 (D.D.C. 2001) (collecting cases).

to cease or perform acts outside its territorial jurisdiction.").[8]  Relying on this principle, American courts have occasionally issued so-called anti-suit injunctions, which are used to forbid a party subject to their jurisdiction from pursuing litigation in a foreign forum.  *See, e.g.*, *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926 (D.C. Cir. 1984) ("It is well settled that English and American courts have power to control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions."); *Balt. & O.R. Co. v. Kepner*, 314 U.S. 44, 55 (1941) (Frankfurter, J., dissenting) (noting the undisputed "historic power of courts of equity to prevent a misuse of litigation by enjoining resort to vexatious and oppressive foreign suits," and collecting cases); *accord* George A. Bermann, *The Use of Anti-Suit Injunctions in International Litigation*, 28 Colum. J. Transnat'l L. 589, 590 (1990) ("Generally

---

[8] *See also Phelps v. McDonald*, 99 U.S. 298, 308 (1878) ("Where the necessary parties are before a court of equity, it is immaterial that the *res* of the controversy . . . is beyond the territorial jurisdiction of the tribunal.  It has the power to compel the defendant to do all things necessary . . . to give full effect to the decree against him. . . . [S]uch courts consider the equities between the parties, and decree *in personam* according to those equities, and enforce obedience to their decrees by process *in personam*.").

In early American jurisprudence, this principle sometimes arose in the context of injunctions preventing a litigant from pursuing a legal action in another state.  *See, e.g.*, *Cole v. Cunningham*, 133 U.S. 107, 118–121 (1890) (collecting English and early American authorities, as well as state court decisions, for the proposition that courts of equity may enjoin parties from prosecuting actions in other jurisdictions).  In *Cole*, the Court emphasized that such suits come within the jurisdiction of an equity court acting *in personam* because they are "not directed to the courts of the other state, but simply to the parties litigant; and, although the power would be exercised . . . with a just regard to the comity which ought to prevail among co-ordinate sovereigns, yet its existence cannot at this day be denied."  *Id.* at 121.  Decades later, the Supreme Court appeared to disavow the distinction between enjoining *parties* and enjoining *foreign courts* in *Donovan v. City of Dallas*: "[W]here the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court.  The fact, therefore, that an injunction issues only to the *parties* before the court, and not to the *court*, is no evasion of the difficulties that are the necessary result of an attempt to exercise that power over a party who is a litigant in another and independent forum."  377 U.S. 408, 413 (1964) (quoting *Peck v. Jenness*, 48 U.S. (7 How.) 612, 625 (1849) (emphasis added).  But *Donovan*'s reference to the "difficulties" associated with inter-forum anti-suit injunctions does not appear to be a statement about the jurisdiction of the enjoining court.  Rather, it seems to be an allusion to a more prudential concern: the fact that inter-forum anti-suit injunctions raise potential comity concerns.  As the Court will go on to discuss, comity is indeed an important consideration that a Court must take into account before issuing or enforcing an injunction that has the effect of burdening litigation in another forum—but it is *not* a jurisdictional matter.  *Cole*, 133 U.S. at 113 (holding that comity considerations "[do] not reach to the jurisdiction of the court, a rule of comity being a self-imposed restraint upon an authority actually possessed"); *see also Steelman v. All Continent Corp.*, 301 U.S. 278, 291 (1937) (upholding an inter-forum anti-suit injunction, rejecting the proposition that "the restraint of a proper party is legally tantamount to the restraint of the court itself," and collecting cases).  It also bears mention that *Donovan* arose from a state court attempting to enjoin a litigant from suing in federal court, a forum provided by Congress.  Thus, *Donovan* was infused with federalism and separation-of-powers considerations absent from the case at hand, which concerns only the relationship between the courts of co-equal sovereigns.

speaking, American courts do not consider it improper to order a person subject to their personal jurisdiction to perform, or refrain from performing, a specified act outside the forum, provided they have a sufficient interest in the performance of that act and intervention is warranted."). The 2001 injunction is akin to an anti-suit injunction, but less extreme: Bilzerian may undertake legal action in foreign jurisdictions but must secure the permission of this Court first.

It is undisputed that Bilzerian was properly subject to this Court's jurisdiction when the 2001 injunction was issued. He remains so today because "[c]ivil contempt proceedings are considered to be a part of the action that is the source of the order that is the subject of the noncompliance." Charles A. Wright & Arthur R. Miller, 4 Fed. Prac. & Proc. § 1017 (4th ed. 2024). Because these contempt proceedings are a continuation of an extant case in which Bilzerian is a party, rather than a new proceeding unto themselves, there is no need to assess the Court's personal jurisdiction anew. Moreover, even if the underlying case had ended, "[a] district court retains jurisdiction to enforce the terms of a previously entered injunction." *Am. Mining Cong. v. U.S. Army Corps of Eng'rs*, 120 F. Supp. 2d 23, 27 (D.D.C. 2000) (collecting cases); *see also Marshall v. Loc. Union No. 639, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Inc.*, 593 F.2d 1297, 1302 (D.C. Cir. 1979) ("The power of a federal court to protect and enforce its judgments is unquestioned."). And when a court issues an order to "cease or perform acts outside the territorial jurisdiction of the court," that order, like any other, "can be enforced through contempt proceedings." *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 717 (E.D. Va. 2012), *vacated on other grounds*, 564 Fed. App'x 710 (4th Cir. 2014). The Court is accordingly satisfied that the instant contempt proceedings suffer from no jurisdictional deficiency.

Nevertheless, the Court must consider whether there are prudential reasons not to move forward with contempt proceedings against Bilzerian. The 2001 injunction is not a true anti-suit injunction, insofar as it still permits litigation with leave of this Court. Nevertheless, Horstwood's requested relief is an end to Bilzerian's St. Kitts lawsuits against him. Thus, the civil contempt proceedings at hand demonstrate that, like an archetypical anti-suit injunction, the 2001 injunction has the potential to burden foreign litigation. Therefore, the Court will assess this application of the 2001 injunction using the same prudential factors that it would consider before issuing an international anti-suit injunction. First, the court must assure itself that enforcement of the injunction is "required to prevent an irreparable miscarriage of justice," whether because it is "necessary to protect the jurisdiction of the enjoining court, or to prevent the litigant's evasion of the important public policies of the forum." *Laker Airways*, 731 F.2d at 927.[9] Second, the Court must consider whether the "domestic interests" identified in the first step "outweigh concerns of international comity." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1107 (D.C. Cir. 2024) (quoting *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 361 & n.4 (8th Cir. 2007)). In Bilzerian's case, the Court finds that both requirements are met.[10]

---

[9] The *Laker Airways* court analyzed the anti-suit injunction in that case for both its jurisdiction-protecting and public policy-advancing properties, but the disjunctive language in this quotation clearly indicates that *either* purpose is sufficient by itself to support the use of an anti-suit injunction. The Fifth and First Circuits have expressed a similar view. *See In re Unterweser Reederei Gmbh*, 428 F.2d 888, 890 (5th Cir. 1970), *aff'd on rehearing en banc*, 446 F.2d 907 (1971), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 (1972) (permitting foreign litigation to be enjoined if it would "(1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) where the proceedings prejudice other equitable considerations"); *see also Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 19 (1st Cir. 2004) ("[W]e agree that either the preservation of jurisdiction or the safeguarding of important national policies may afford a sufficient basis for the issuance of an international antisuit injunction.").

[10] Some courts have additionally held that an anti-suit injunction requires that the suit in which the injunction is sought and the suit to be enjoined must share the same parties and issues. *See, e.g.*, *Quaak*, 361 F.3d at 18 ("The gatekeeping inquiry is, of course, whether parallel suits involve the same parties and issues. Unless that condition is met, a court ordinarily should go no further and refuse the issuance of an international antisuit injunction."). It is not clear that such a requirement would be implicated here because, to reiterate, the 2001 injunction is not, strictly speaking, an

First, the 2001 injunction was calculated to prevent Bilzerian's continued subversion of vital policy interests. Bilzerian perpetrated enormously grave violations of federal securities laws and has deployed abusive litigation tactics to evade accountability for those violations up to the present day. A recent indictment filed in the Central District of California, charging Bilzerian with wire fraud and conspiracy, estimates that the outstanding civil judgments against him are now worth a staggering $180 million, of which a meager $547,000 has been recovered. *See* Indictment ¶ 1.c, *United States v. Bilzerian*, No. 24-cr-0569-MEMF (C.D. Cal. Sept. 26, 2024), Notice of Recently Filed Actions ex. 1, ECF No. 1253. It goes without saying that enforcement of federal securities law, particularly against such costly violations as Bilzerian's, is an important public interest. Just as damning, however, is the fact that Bilzerian manipulated U.S. bankruptcy proceedings as part of his ongoing plot to dodge responsibility for his civil judgments. *See SEC v. Bilzerian*, 815 F. Supp. 2d at 325–26. The vindication of not one, but two critically important federal statutory schemes—securities law and bankruptcy—undoubtedly provides a sufficient public policy rationale to justify the extraterritorial enforcement of the 2001 injunction. *Cf. Laker Airways*, 731 F.2d at 932 (acknowledging that American antitrust statutes are of "admitted economic importance to the United States," and therefore sufficient to warrant the issuance of an anti-suit injunction).[11]

---

"international antisuit injunction." Moreover, although the D.C. Circuit in *Laker Airways* noted the requirement of "duplication of parties and issues," it articulated this requirement during its discussion of whether the anti-suit injunction was necessary to protect the issuing court's jurisdiction. At most, then, this Circuit's precedent suggests that identity of parties is required if an international anti-suit injunction is issued to protect the enjoining court's jurisdiction. The 2001 injunction, by contrast, was issued to advance the important public policy concerns of the United States. Thus, even if the 2001 injunction were considered an anti-suit injunction, there is no binding authority to suggest that "duplication of parties and issues" is necessary in this case. It is hard to imagine how the "duplication of parties" requirement could even be applied to a permanent injunction stemming from a dispute involving a public authority, rather than two private parties—and even harder to imagine how the injunction could have survived appeal three times if it were deficient in this regard.

[11] The fact that Bilzerian's particular dispute with Horstwood does not directly implicate either of these policy areas is inapposite. By its own terms, the 2001 injunction encompasses the commencement of any type of proceedings.

Turning to the second prudential factor, the 2001 injunction does not substantially infringe on international comity. "Comity defines the 'extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation." *Kurd v. Republic of Turkey*, 438 F. Supp. 3d 69, 92 (D.D.C. 2020) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163 (1895)). International comity has been described as "a complex and elusive concept," *Laker Airways*, 731 F.2d at 937, which demands "due regard both to international duty and convenience, and to the rights of [the forum state's] own citizens, or of other persons who are under the protection of its laws." *Hilton*, 159 U.S. at 113. Because "comity varies according to the factual circumstances surrounding each claim for its recognition," *Laker Airways*, 731 F.2d at 937, the Court must undertake a "particularized analysis of the respective interests of the foreign nation" and the forum nation. *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 543–44 (1987).

As already described, the 2001 injunction serves important American interests in the integrity of its securities and bankruptcy laws. On the other side of the scale, it does next to nothing to hamper the interests of St. Kitts & Nevis or its citizens. First, the 2001 injunction is intended to *prevent* a single individual from initiating vexatious lawsuits. That is a far less egregious affront

---

The injunction's wide scope was a deliberate choice: based on Bilzerian's past behavior, the Court felt that it could not reasonably predict the lengths to which he might go to dodge responsibility for his actions. *See, e.g., SEC v. Bilzerian*, 815 F. Supp. 2d at 326 (noting that Bilzerian used a bankruptcy proceeding in the name of his wife, Terri, to shield the assets of an entity in which he had a financial interest). The Court accordingly ordered him to seek permission before commencing *any* type of proceeding in *any* forum, so that the Court could smoke out any frivolous or oppressive lawsuits before they began, lest federal securities or bankruptcy law be further evaded or abused. In other words, the 2001 injunction had to be purposefully inclusive so as to best protect the vital public policy interests underlying its issuance. Its capaciousness is a feature, not a bug. The injunction is meant to be enforced as written; the fact that any *particular* violation of the injunction does not seem to infringe on its motivating policy interests is beside the point.

to the independence and authority of a foreign tribunal than many international anti-suit injunctions, which often order the termination of a specific ongoing foreign proceeding or, worse yet, prevent the enforcement of a foreign court's judgment after the fact.[12, 13] Second, the 2001 injunction does not single out any *particular* foreign country or tribunal, lessening the likelihood that a coordinate sovereign will interpret enforcement of the injunction as an individualized slight. Indeed, the 2001 injunction would have had no international ramifications whatsoever but for Bilzerian's choice to move abroad, a decision that— by his own admission—he made specifically to evade the operation of the injunction.[14]  Third, because the 2001 injunction only encompasses suits initiated *by Bilzerian*, it does not interfere with the interests or operations of foreign governments who may wish to proceed against him, nor does it encumber any other litigant in St. Kitts or anywhere else.  *Cf. Laker Airways*, 731 F. 2d at 942 (emphasizing that the anti-suit injunction at issue was directed at a suit between private parties, even though it affected the enforcement of UK laws); *NextEra Energy*, 112 F.4th at 1109 ("[A]n anti-suit injunction against a foreign sovereign presents more serious comity concerns than one against a private entity."). Fourth, under the terms of the injunction, Bilzerian is still permitted to litigate in foreign forums;

---

[12] *See, e.g.*, *Microsoft v. Motorola, Inc.*, 871 F. Supp. 2d 1089 (W.D. Wash. 2012) (issuing an injunction prohibiting a patentee from enforcing injunctive relief it had received from a German court); *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*, No. 8:14-cv-00341-JVS-AN, 2015 WL 13954417, at *4, 7 (C.D. Cal. 2015) (enjoining already-initiated patent infringement actions in France, the UK, Brazil, Russia, Argentina, and Germany).

[13] Admittedly, litigation has already begun in the Eastern Caribbean Supreme Court in this instance, and the effect of this Court's contempt order will indeed be to command Bilzerian to terminate those proceedings.  However, the disruption of extant proceedings was not the purpose of the 2001 injunction; the unfortunate fact that the St. Kitts litigation must now be brought to a halt is properly attributable to Bilzerian's decision to *ignore* the 2001 injunction, not to the injunction itself.

[14] *See* Response to Order to Show Cause 2 ("More than seven years ago, on June 13, 2017, Bilzerian filed a Motion to Terminate the [2001 injunction] which the Securities and Exchange Commission did not oppose.  Nonetheless, on May 27, 2018, this Court denied the Motion.  This Court should take comfort in knowing that this was the very reason he chose to renounce his United States citizenship.") (citations omitted).

he must simply secure the permission of this Court first.[15]  In these respects, the 2001 injunction compares favorably, comity-wise, to a paradigmatic anti-suit injunction.

After weighing the foreign and domestic interests at play, the Court concludes that enforcing the 2001 injunction through contempt proceedings, even in relation to conduct performed in a foreign country, and even when measured against the demanding standard for an anti-suit injunction, is a lawful exercise of the Court's equitable authority.

## V.    Bilzerian's Remaining Arguments Against the Injunction Are Meritless

Bilzerian's argues alternatively that the Court should dissolve the 2001 injunction, or otherwise that it should reconsider its Order granting Horstwood's Motion to Intervene.  Both of these arguments are easily dispensed with.

First, as noted above, Bilzerian has asked this Court on a prior occasion to release him from the 2001 injunction.  *See generally* Mot. for Relief from Judgment.  After this Court refused that invitation and Bilzerian appealed, the D.C. Circuit affirmed, holding that Bilzerian had not "demonstrated 'a significant change either in factual conditions or in law' that renders continued enforcement of the filing injunctions entered against him 'detrimental to the public interest,'" as is his burden under Federal Rule of Civil Procedure 60(b).  *SEC v. Bilzerian*, 811 Fed. App'x at 4 (quoting *Am. Council for the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017) (internal quotations omitted)).  The same is true today: he "now asks this Court to consider *sua sponte* terminating the [2001 injunction]," but does not make even a token effort to explain *why* the Court should do so.  Response to Order to Show Cause at 2.  Neither does the Court independently perceive any reason to terminate the injunction.  Therefore, the injunction will stand.

---

[15] Bilzerian, for his part, is perfectly aware of this: In 2017, he asked this Court for permission to participate in his wife's bankruptcy case in the Middle District of Florida.  *See* Motion for Permission to Participate in Bankruptcy Case, ECF No. 1216.  Permission was denied in that instance because of his prior efforts to use his wife's bankruptcy proceedings to shield his own assets.

Second, Bilzerian has also urged the Court to reconsider its Order permitting Horstwood to intervene in the case. This request, like the one just discussed, is entirely devoid of reasoning. It does not engage with the legal standard for reconsideration, nor does it present the court with any information suggesting that there has been a "significant change in the law or facts" since Horstwood's motion, that the Court "made a decision outside the adversarial issues presented . . . by the parties," or that the Court made an "error . . . of apprehension" in granting Horstwood's Motion. *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quoting *Cobell*, 224 F.R.D. at 272). Instead, it merely directs the Court's attention to "the reasons set forth in Bilzerian's Opposition to Horstwood's Motion to Intervene and Bilzerian's SurReply." Response to Order to Show Cause at 2 (citations omitted). In other words, Bilzerian is asking the Court to consider the very same arguments that it has already considered and rejected. Absent any stated reason to do so, the Court declines to reconsider its Order permitting Horstwood to intervene.[16, 17]

## VI.    Bilzerian Is in Civil Contempt of the 2001 injunction

To reiterate, civil contempt requires "an order that is clear and unambiguous" and a "violation . . . proved by clear and convincing evidence." *Broderick,* 437 F.3d at 1234. As for the first requirement, there may have been a non-frivolous *legal* question prior to this Opinion as to whether the Court had the authority to enforce its injunction in a foreign jurisdiction. However,

---

[16] Bilzerian claims obliquely that Horstwood "[l]acks [s]tanding to [i]ntervene in this [c]ase." Response to Order to Show Cause at 2. It is unclear whether Bilzerian is referring to the doctrine of Article III standing. If he is, then it bears mention that the Court has already concluded that "Horstwood has satisfied the requisites of Article III standing." *See* Order Granting Motion for Post-Judgment Intervention 2, ECF No. 1247. Again, Bilzerian has provided the Court with no reason to disturb this holding.

[17] What's more, as this Court has explained to Bilzerian before, even if Horstwood should not have been permitted to intervene, the Court has inherent authority to initiate orders to show cause; even if the decision to allow Horstwood to join the suit was erroneous, Bilzerian would nevertheless be obliged to defend the show cause order. *SEC v. Bilzerian*, 613 F. Supp. 2d at 72.

the *terms of the injunction itself* were always "clear and unambiguous"[18]: Bilzerian is not to commence or cause the commencement of proceedings in any court beside the D.C. District Court or the D.C. Circuit without this Court's permission, period.

It is enough, for purposes of this Opinion, that the meaning of the 2001 injunction is "clear and unambiguous" in an objective sense; civil contempt does not require that a violation be subjectively willful or knowing. *See N.L.R.B. v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir. 1981) ("In civil contempt proceedings . . . the intent of the recalcitrant party is irrelevant."). But even so, Bilzerian's behavior further suggests that he *subjectively* understood the 2001 injunction's requirements and chose to proceed in spite of that knowledge. Specifically, Bilzerian notified the Court of his change of residence in May 2017, then asked the Court to release him from the injunction the following month. *Compare* Notice of Change of Address, ECF No. 1212 (May 2017), *with* Mot. for Relief from Judgment, ECF No. 1215 (June 2017). If Bilzerian sincerely believed the 2001 injunction did not apply by virtue of his relocation to St. Kitts and change of citizenship, the latter motion would have been superfluous. Moreover, Bilzerian's own court filings evince his understanding that the 2001 injunction applies anywhere he may go. S*ee* Mot. for Permission to File Motions 1, ECF No. 888 ("On July 5, 2001 and July 19, 2001, this Court entered *ex parte* injunctions, that permanently enjoin me from commencing any proceeding in any court ('Permanent Injunctions')."). Thus, the requirement of a "clear and unambiguous order" is easily met here.

The only remaining question for purposes of civil contempt is whether Horstwood has provided clear and convincing evidence that Bilzerian violated the injunction by commencing or

---

[18] An order does not fail the "clear and unambiguous" prong of the civil contempt analysis merely because the subject believes that the order is legally defunct. *See Powell v. United States*, 226 F.2d 269, 276 (D.C. Cir. 1955) ("It is, of course, well-established . . . that a person must comply with an order of a court whether the order is valid or invalid, until judicial action stays or sets aside the order.").

causing the commencement of proceedings without the Court's permission.  Despite the tortuous factual background of this dispute, the answer is straightforward: yes, he did.

To "cause" means, simply, "[t]o bring about or effect."  *Cause*, Black's Law Dictionary (12th ed. 2024).  Thus, one can "cause" the commencement of a legal proceeding without being a named party in that proceeding.  For example, a lawyer (or someone acting as a lawyer) who initiates a legal action, whether by filing it or by substantially assisting the filer, has "caus[ed] the commencement" of that proceeding.  Likewise, if a non-litigant with a strong personal interest in a hypothetical lawsuit successfully spurs somebody else to take that case to court, that non-litigant has "caus[ed] the commencement" of that proceeding, even though he may not be the named plaintiff himself.  Indeed, the Court made it clear to Bilzerian that the 2001 injunction incorporates a broad understanding of the word "cause" when, in its 2009 civil contempt proceedings, it summarized the injunction as follows: "Paul Bilzerian is to play *no role* in the commencing of a lawsuit."  *SEC v. Bilzerian*, 613 F. Supp. 2d at 71 (emphasis added).

Horstwood has shown by clear and convincing evidence that Bilzerian has caused the commencement of legal proceedings.  As discussed above, Horstwood's exhibits clearly demonstrate the existence of three separate legal proceedings in which Adam Bilzerian, Horstwood's companies, or both are the nominal claimants.  However, Adam Bilzerian's footprint is virtually absent from all of these lawsuits: in each one, Paul Bilzerian took over the litigation entirely from his son, personally handling all of the court appearances and filing of motions and affidavits.  *See* Judgment of July 25, 2019, Mot. for Order to Show Cause at 284 ("Mr. Paul Bilzerian has acted as solicitor and advocate without restriction on behalf of his sons and the companies of which he is a director.  He has exercised a surprisingly unrestricted right of audience . . . and has acted to all intents and purposes as if he were a person qualified to practice . . . as an

Attorney-at-Law in Saint Christopher and Nevis.").  Where the companies are concerned, Bilzerian equally was the driving force behind the litigation, appearing as the representative or director of the companies.  His signature is ubiquitous in the litigation record.  And it is equally clear that the litigation in St. Kitts primarily, if not entirely, revolves around his own personal dealings.  Though the many documents Horstwood signed nominally show Adam Bilzerian as his counterparty, the voluminous body of email exchanges between Paul Bilzerian and Horstwood show that it was Paul Bilzerian who was truly behind these business machinations all along.[19]

It is not clear from the record whether Paul Bilzerian had a direct hand in drafting or filing the complaints that literally initiated each of these three suits.  But it *is* clear that he was in complete control of each lawsuit, formally or informally, from the very beginning.  The judge in the 2016 suit confirmed as much when, after beholding Bilzerian's predominant role in the case, she inquired semi-rhetorically whether Bilzerian should be made a party to the litigation, or indeed whether he already was one under the definition provided in the local Civil Procedure Rules.  Bilzerian's personal control over and centrality to each of the three St. Kitts lawsuits, from start to end, is sufficient to establish that he played a role in their commencement, as he was forbidden to do.

Bilzerian also violated the 2001 injunction when he personally appealed an adverse judgment in the 2011 suit.  *See, e.g.*, Aff. in Support of Request for Written Decision, Mot. for Order to Show Cause ex. KAH C-5, at 116 (in which Bilzerian, in a signed affidavit, states he

---

[19] That Adam Bilzerian served mostly as a front for Paul Bilzerian, who remains the real party in interest up to the present day, is further demonstrated by a November 5, 2024 filing in the consolidated 2011 and 2016 suits requesting the substitution of Bilzerian's firm, IIL, for Adam Bilzerian as the claimant.  *See* Notice of Filing Foreign Court Documents 3, ECF No. 1255.  The document notes that Adam Bilzerian assigned his interests in the matter to IIL.  *Id.* at 8.  Recall that the loan Horstwood received was *initially* from IIL, before Horstwood signed a set of replacement loan documents identifying Adam Bilzerian as the lender.  *See* Loan Documents, Mot. for Order to Show Cause ex. KAH E-12, at 614.  Thus, the loan at issue in the St. Kitts litigation originated with Bilzerian's company, was transferred to Adam Bilzerian, and has now been transferred back again.

appealed a 2015 decision by Justice Carter); Horstwood's Opposition to Appeal, Mot. for Order

to Show Cause ex. KAH C-29, at 396 (responding to an interlocutory appeal initiated by Bilzerian).

The 2001 injunction includes a specific carve-out for appeals: Bilzerian is not required to seek

permission before undertaking "appeals of this Court's Orders to the United States Court of

Appeals for the District of Columbia . . . ." This explicitly narrow exception clearly communicates

that taking an appeal constitutes the "commencement of proceedings" within the meaning of the

2001 injunction. If Bilzerian does so in an appellate court other than the D.C. Circuit, he must

first secure this Court's permission. In this case, he failed to do so.[20]

Bilzerian, for his part, does not substantially deny his role in the St. Kitts litigation; his sole

argument is that he was not personally named as a party in any of the actions, and that he merely

"assisted his sons and their attorneys . . . through powers of attorney." Response to Mot. for Order

to Show Cause at 4. As a legal matter, this defense rests on an interpretation of the 2001

injunction—i.e., that it only encompasses named parties—that is both too narrow for its plain

language to bear, and that is irreconcilable with this Court's prior admonition that Bilzerian must

"play no role" in the initiation of a lawsuit. And as a factual matter, Bilzerian's defense abjectly

understates his role in the three lawsuits. Each lawsuit revolved around financial machinations in

which Bilzerian was the principal player. Each lawsuit came to be personally dominated by

Bilzerian himself. The 2011 suit followed suspiciously soon after Bilzerian threatened that he

would "advise Adam" to act against Horstwood. Email of Oct. 20, 2011. The 2017 suit is even

---

[20] Bilzerian also violated the injunction when, in 2023, Bilzerian filed an amended claim in his 2017 lawsuit which removed Adam Bilzerian as a claimant, leaving only the Lemon Grove Company, for whom Bilzerian appeared as a representative and director. *See* Judgment of Mar. 23, 2023, Mot. for Order to Show Cause ex. KAH C-24, at 346–48. Adam Bilzerian evidently had no say in the matter because Paul Bilzerian was acting pursuant to his power of attorney. Bilzerian cannot circumvent the 2001 injunction by taking over litigation formally commenced by somebody else after the fact, particularly where he controls the decisions of that person.

more damning: as noted above, the Power of Attorney in that case was filed virtually immediately, giving Bilzerian control over the litigation from the very beginning.

In 2009, this Court found that Bilzerian was in contempt in part because the record demonstrated that he "was threatening litigation" and "advising the plaintiffs' attorneys," which together demonstrated that he had "exercise[ed] control over the litigation in an effort to cause a lawsuit to be commenced . . . ." *SEC v. Bilzerian*, 613 F. Supp. 2d at 71. The same indicators of contempt, and more, are present here.

It strains credulity to imagine that Bilzerian played no role in the commencement of these actions. Still, Bilzerian would have the Court believe that this is all a coincidence—he merely served in an advisory role in each of the lawsuits. In other words, he asks the Court to accept that Adam Bilzerian initiated these legal actions wholly of his own accord; that Adam did not coordinate in advance with Paul Bilzerian; and that Paul Bilzerian merely stepped in after the fact as a counsellor or assistant. That, simply put, is nonsense. Horstwood has compiled an extensive record showing Bilzerian's intimate involvement in the St. Kitts litigation, which Bilzerian has not refuted. The Court need not approach that record with childlike naivete or eschew its common sense. Paul Bilzerian played a role in the commencement of all three lawsuits.

Bilzerian attaches roughly 200 pages of exhibits to his response, which largely detail the many disadvantageous agreements that Horstwood signed throughout their relationship. *See* Exhibits to Response, Response to Order to Show Cause Attach. 1, ECF No. 1254-1. Those exhibits may constitute evidence against Horstwood in a hypothetical lawsuit about the ownership of Horstwood's companies or the debt that Horstwood owes to Adam Bilzerian. But those questions are not relevant to this Opinion. The narrow issue here is whether Bilzerian caused the commencement of legal proceedings without the permission of this Court, in violation of the 2001

injunction. Whether those unpermitted proceedings are meritorious is entirely beside the point. If Bilzerian has a real case, whether against Horstwood or anybody else, he need only secure leave of this Court to pursue it. Here, he did not.

In summary, the Court finds by clear and convincing evidence that, both by causing the commencement of new legal actions on behalf of his son and his companies, and by pursuing appeals of adverse judgments arising from those suits, all without leave of this Court, Bilzerian violated the terms of the 2001 injunction. Given the strength of the undisputed evidence, there is no need at this time for additional in-person proceedings to determine whether Bilzerian is in contempt. Nor, to reiterate, is there any reason to determine the truth or falsity of the remainder of Horstwood's saga. Unless this Court has reason to take it up at a later time, that task is best left to the courts of St. Kitts in a hypothetical future proceeding on the merits of his claims against Horstwood—provided that Bilzerian first secures this Court's permission, of course.

The Court therefore holds that Bilzerian is in civil contempt of the 2001 injunction.

\*           \*           \*

## VII.    Conclusion

Horstwood's requested relief is that Bilzerian be ordered to dismiss any of his lawsuits still pending against Horstwood in St. Kitts.  Accordingly, this Court will **ORDER** Bilzerian, as well as his attorneys and associates (to include Adam Bilzerian, IIL, IIG and any other firm that Bilzerian purports either to own or to serve as a director) to dismiss all pending lawsuits against Horstwood in St. Kitts and in any other domestic or foreign forum.  The Court will also **ORDER** Bilzerian to provide a copy of the accompanying order to Adam Bilzerian, Dan Bilzerian, and his associates and attorneys, so that they may be made aware that the 2001 injunction continues to have force outside the territorial limits of the United States.

Bilzerian and his associates are advised that further contumacy may be met with the initiation of criminal contempt proceedings.


Date: ____1 - 24 - 25____

Royce C. Lamberth
United States District Judge