UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.                              Case No. 89-1854 (RCL)

PAUL A. BILZERIAN,

    Defendant.

_____/

## KEVIN HORSTWOOD'S VERIFIED REPLY IN SUPPORT OF VERIFIED MOTION TO ENFORCE COURT ORDER AND FOR INITIATION OF CRIMINAL CONTEMPT PROCEEDINGS AGAINST ADAM BILZERIAN

Intervenor **Kevin Horstwood**, *pro se* ("Horstwood"), respectfully submits this Reply to Intervenor Adam Bilzerian's Opposition to Horstwood's Verified Motion to Enforce Court Order and for Initiation of Criminal Contempt Proceedings (Dkt. 1267). Adam Bilzerian's opposition lacks merit both procedurally and substantively. It fails to rebut the core findings of contempt and raises untenable defenses in an effort to evade accountability. As shown below, Adam Bilzerian (hereafter "Adam") has been a party to this case since 2001 and received due notice of the contempt proceedings, yet chose not to contest them until now. He does not dispute the factual findings already made by this Court – effectively conceding them – and his legal arguments misstate the law or rely on sham transactions within his family's control. Horstwood's motion should be granted in full, Adam's opposition overruled, and criminal contempt proceedings commenced to vindicate the Court's authority.





1

**I. Adam Bilzerian Was a Party to this Case Since 2001 and Failed to Oppose the Show Cause Motion, Rendering it Uncontested.**

Adam's procedural posture in this matter fatally undercuts his opposition. He has been an **intervenor party** in this litigation since May 2001, when he moved to intervene (Dkt. 263) and the Court granted his motion (Dkt. 289). When Horstwood filed the Motion for Order to Show Cause on July 26, 2023 (Dkt. 1248), Horstwood sought relief against Adam and Horstwood served Adam both by e-mail and by U.S. mail. Horstwood also provided copies of the motion to Derriann Charles, Adam's attorney in St. Kitts. Notably, Adam **did not file any response or opposition** to the Show Cause Motion at that time, nor did he respond to the Court's September 20, 2024 Order directing Paul Bilzerian to show cause (Dkt. 1251), which put Adam's conduct squarely at issue. By failing to oppose or respond timely, Adam left Horstwood's allegations **uncontested** insofar as they concerned him.

Under the local rules of this Court, a party's failure to oppose a motion permits the Court to treat the motion as conceded. *See* D.D.C. LCvR 7(b); *Fox v. Am. Airlines, Inc.*, 389 F.3d 1291, 1294 (D.C. Cir. 2004) (district court has discretion to deem unopposed motions conceded). Adam had a full and fair opportunity to be heard in 2023 when Horstwood initiated contempt proceedings, yet he **chose silence**. He cannot resuscitate defenses now that should have been raised then. His opposition is procedurally late and should be given no weight. In effect, the relief Horstwood sought in the Order to Show Cause was **unopposed by Adam**, and the Court was entitled to act on Horstwood's evidentiary showing without any contrary input from Adam. This context frames all of Adam's current arguments as belated and procedurally waived.

**II. Adam Has Not Contested the Court's Factual Findings of Contempt, Which Should Be Deemed Admitted.**

Even if the Court considers Adam's opposition on the merits, it is striking that Adam **does not dispute any of the key findings** in the Court's January 24, 2025 Memorandum Opinion (Dkt. 1256) or the accompanying Order (Dkt. 1257) holding Paul Bilzerian ("Paul") in contempt. Adam's submission nowhere challenges the Court's determination that multiple lawsuits were filed in St. Kitts against Horstwood at Paul Bilzerian's instigation. He does not deny that those actions violated the plain terms of the July 19, 2001 Injunction, which prohibits Paul and those in active concert with him from "commencing or causing the commencement of proceedings in any court" outside this Court without permission. Nor does Adam rebut the evidence (including extensive emails and filings) showing that Paul used Adam as the nominal plaintiff to evade the injunction. In fact, Adam's opposition **acknowledges** the Court's finding that "Paul was responsible for the St. Kitts litigation." *Id.*

By failing to contest these findings, Adam has effectively **conceded their truth**. Courts routinely deem arguments or facts admitted when a party does not address them. *See, e.g., Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (unchallenged arguments deemed conceded). Here, Adam's silence regarding the contempt findings speaks volumes. He does not contest that he acted (at Paul's direction) in violation of the injunction, nor that he was an integral participant in the contumacious foreign litigation campaign. Because Adam has not disputed the factual basis underpinning the contempt, those facts are established for purposes of this motion. The Court's detailed findings in its Memorandum Opinion – which Adam pointedly does **not** challenge – should be treated as **undisputed and admitted** by Adam.

**III. Rule 408 Does Not Bar Horstwood's Limited Use of Settlement Communications for a Permissible Purpose.**

Adam's opposition improperly invokes Federal Rule of Evidence 408 to suggest that Horstwood's motion relies on inadmissible settlement communications. This argument mischaracterizes Horstwood's position and misunderstands Rule 408. Rule 408 prohibits using statements made in compromise negotiations **"to prove or disprove the validity or amount of a disputed claim"**. *See* Fed. R. Evid. 408(a). It does **not**, however, bar evidence of settlement discussions when offered for other legitimate purposes. *See* Fed. R. Evid. 408(b) (allowing such evidence for purposes like proving notice, intent, or knowledge).

Horstwood has not offered any settlement communication to prove the truth of the matters asserted therein, nor to establish Adam's liability on the underlying claims. Rather, any references to settlement communications are made solely to demonstrate their **existence and context**, such as showing that Adam was aware of his obligations and was given opportunities to comply outside of litigation. For example, Horstwood's motion notes that certain communications occurred in which Horstwood sought a resolution of the St. Kitts litigation – not to prove the content of those discussions as true, but to show Adam's knowledge and willfulness in refusing a lawful request. Introducing the **fact** that settlement talks took place (without delving into their substance for the truth of any matter) is **not prohibited** by Rule 408. *See, e.g., Kraft v. St. John Lutheran Church,* 414 F.3d 943, 947 (8th Cir. 2005) (Rule 408 does not exclude the use of settlement agreements to prove a party's knowledge of certain facts); *Athey v. Farmers Insurance Exchange*, 234 F.3d 357, 359 (8th Cir. 2000) (settlement offer attempting to condition settlement on the release of a bad faith claim is itself admissible evidence of bad faith).

4

Accordingly, Adam's Rule 408 objection is misplaced. Horstwood is offering evidence of the existence of settlement efforts to illustrate Adam's state of mind and the sequence of events – **permissible purposes** outside the narrow scope of Rule 408's exclusion. The Court can consider such evidence in evaluating contempt without running afoul of the evidentiary rules. Adam cannot use Rule 408 as a shield to obscure the fact that he was given chances to halt his contemptuous conduct and declined to do so.

## IV. Adam Had Ample Notice and Opportunity to Be Heard, and Was Properly Included in the Order to Show Cause.

Adam contends that he "was not ordered to show cause" and implies he lacked due process because the Court's September 20, 2024 Order to Show Cause named only Paul Bilzerian. This argument elevates form over substance and ignores the record. Horstwood's initial Motion for Order to Show Cause (Dkt. 1248) plainly alleged that Paul was operating under the guise of his son Adam to carry out forbidden litigation. Adam was served with that motion in 2023 as an interested party, given that it directly put his actions at issue. The onus was then on Adam to come forward if he disputed his role. He did not.

While the formal Show Cause Order (Dkt. 1251) directed Paul to respond, Adam was **on notice** that the Court would consider the allegations about his involvement. Indeed, Adam acknowledges he was aware of Horstwood's motion – his own opposition notes the motion was filed and even recites its docket number. Having received notice, Adam had the **opportunity to oppose** the motion or to submit his position to the Court before the Court ruled. He simply failed to do so. That is a problem of Adam's making, not a due process violation. As the D.C. Circuit has held, due process in contempt proceedings is satisfied when the alleged contemnor is given notice of the allegations and

a chance to respond, even if no oral evidentiary hearing is held. *See SEC v. Bilzerian*, 613 F. Supp. 2d 66, 72–73 (D.D.C. 2009) (finding alleged contemnors had an opportunity to be heard through written submissions). Adam had such an opportunity here – and he ignored it.

Moreover, Adam was **specifically named in the Court's January 24, 2025 Contempt Opinion and Order**. The Court not only found that Paul violated the injunction through Adam's actions, but it went on to order affirmative relief that necessarily involved Adam – namely, that all lawsuits against Horstwood in St. Kitts be withdrawn. The Court's Opinion referenced the attempt to substitute IIL for Adam as claimant, confirming the Court understood Adam's connection. Thus, by the time of the contempt Order (Dkt. 1257), Adam was effectively directed to act (in concert with Paul) to halt the foreign suits. He cannot credibly claim he was not "ordered to show cause" or that he lacked notice that his compliance was required. The record shows he was aware, was served, and was even mentioned in the Court's rulings. Any due process argument fails in light of Adam's **actual notice and opportunity**.

In sum, Adam was properly before the Court and had every chance to defend himself. His decision to sit on the sidelines until after the contempt order was entered is not grounds to undo that order or forestall contempt consequences. The Court should reject Adam's attempt to recast himself as an uninvolved "non-party" – he has been a party for decades and was a key player in the events giving rise to the contempt. Having been given notice, he cannot now complain that he was not formally named in the show cause directive. The substance of due process was satisfied, and Adam's rights were not prejudiced.

**V. Adam's Purported Lack of "Legal Ability" to Terminate the St. Kitts Lawsuits Does Not Absolve Him of Compliance.**

Adam next argues that he **"has neither the legal ability nor the right"** to discontinue the St. Kitts lawsuits because he assigned his interest in those suits to International Investments Ltd. ("IIL") in March 2023. According to Adam, this assignment contractually bars him from withdrawing the suits and leaves him powerless to comply with this Court's order. This defense is unavailing. Adam cannot unilaterally strip himself of the ability to obey a court order and then claim "impossibility" of compliance.

First, Adam's assignment to IIL **does not extinguish his obligation** to comply with the Court's injunction and contempt order. The July 19, 2001 Injunction binds not only Paul but also those in active concert with him who have notice. Adam's intervention in this case was prior to July 19, 2001, and Adam had active counsel in this matter on July 19, 2001, who withdrew on November 13, 2001 (Dkt. 547). Adam, as Paul's agent/son used to file the suits, was unquestionably bound, as he had notice. The Court's January 24, 2025 Order reinforced that obligation by mandating that all Bilzerian-instigated lawsuits against Horstwood be withdrawn. That command applies to Adam; he was the original claimant in St. Kitts and the one in position to effect a discontinuance (either directly or through IIL). A litigant **cannot evade an injunctive duty by deputizing a stand-in**. If Adam could initiate litigation through a proxy (IIL), he likewise can ensure that litigation is ceased through that same proxy. His claimed "legal inability" is a fiction of his own making.

Second, the assignment agreement with IIL does not immunize Adam from complying, nor does it subject him to any valid liability for doing so. Adam suggests that if he causes the suits to be dropped, he would breach his contract with IIL and face

7

consequences in "another judicial forum". Even if that were true, it is **no defense** to contempt. A party may not prefer a private contract over a federal court order. To the extent there is any conflict, the court order prevails as a matter of public policy. Adam **"cannot be held liable"** to IIL for obeying a lawful court directive; any contract term purporting to prevent compliance with a court order is void as against public policy. Courts have long recognized that contracts facilitating illegality or contempt are unenforceable. *See, e.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (contracts contrary to public policy cannot be enforced). If IIL or its principals were to attempt retaliation against Adam for withdrawing the lawsuits, Adam could assert his compliance with a U.S. court order as a complete defense. In short, the speculative risk of civil liability to a friendly third party does not excuse defiance of a court mandate.

Finally, Adam's position – that he **made himself unable to comply** – is fundamentally inconsistent with contempt law. It is well settled that a contemnor claiming "inability" to comply must demonstrate that the inability was not self-created. *See* **SEC v. Bilzerian**, 112 F. Supp. 2d 12, 26 (D.D.C. 2000) ("[A] alleged contemnor must show 'categorically and in detail' why he is unable to comply – and that any inability was not self-induced."). Here, any inability is entirely **self-induced** by Adam's voluntary assignment to IIL. He cannot shed his obligations by orchestrating a transfer of the very claims this Court ordered him to stop pursuing. Allowing such an excuse would create a perverse loophole: anyone could avoid compliance by transferring their interest to an affiliate. The law does not countenance this. Adam remains on the hook to do everything in his power to effectuate the Court's order, regardless of the assignment. If that requires

asking IIL to honor the court order or taking steps to reverse the assignment, so be it. His own contractual entanglements do not supersede a federal injunction.

In sum, Adam's "legal inability" defense fails. The assignment to IIL neither removes his duty to comply nor truly renders him incapable of doing so. At most, it creates a potential secondary dispute – one that pales in comparison to his primary obligation to obey this Court. Adam has provided no authority that an assignment can nullify a contempt obligation; on the contrary, precedent emphasizes that **self-created hurdles are not a defense** to contempt. Adam must comply with the Court's directive to terminate the St. Kitts actions, and his deal with IIL cannot absolve him of that duty.

## VI. One Cannot Escape Contempt by Assigning Away the Subject of the Contemptuous Conduct.

Expanding on the above, Adam's contention boils down to an assertion that he can **avoid contempt by assigning away his rights** in the disputed litigation. This proposition is legally unsupportable. A party cannot rid himself of a contemptuous act (or the power to rectify it) through a transfer to a third party and then claim an inability to comply. Courts vigorously reject such maneuvers designed to circumvent judicial orders.

The scheme attempted here is transparent: after instigating the lawsuits against Horstwood (in violation of the injunction), Adam transferred the claims to a newly interposed entity (IIL) and now argues that because he has assigned them, he cannot be held responsible. But permitting this would make injunctions and contempt orders **toothless**. If contemnors could assign away the *res* of a dispute, or delegate the prohibited conduct to someone else, and thereby insulate themselves from contempt, every injunction could be evaded by a paper transaction. That is not the law. Federal Rule of Civil Procedure 65(d) binds not just the parties but also their proxies, agents, and

anyone in active concert with them who has notice of the order. Adam's assignment to IIL is a textbook example of an act in *active concert* with the enjoined party (Paul) to continue the forbidden litigation under a different name. IIL stands in Adam's shoes for all practical purposes; it was enlisted to carry on what Adam (and Paul) could not do openly. Thus, IIL itself is bound by the injunction as a person acting in concert with Adam/Paul, and Adam cannot use IIL as a shield.

Courts have not hesitated to hold parties in contempt for actions taken through strawmen or affiliates. This Court has previously held Paul Bilzerian and others in contempt of the 2001 Injunction for pursuing litigation via third parties and affiliated entities (Dkt. 986, 1091). The D.C. Circuit affirmed that judgment, underscoring that the injunction's reach extends to those who act in concert with the enjoined party. By the same token, Adam's post hoc assignment does not place him beyond the Court's contempt power. *SEC v.* Bilzerian, 410 F. App'x. 346 (D.C. Cir. 2010). The **contemptuous actions – the continued prosecution of the St. Kitts suits – cannot be laundered away** by assigning the cause of action to a friendly entity. Adam remains answerable for those actions because he set them in motion and remains closely tied to IIL's ability to continue or halt them.

Fundamentally, contempt is about **willful disobedience** of a court order. Adam's willful intent is evidenced, if anything, *more clearly* by the assignment: it was executed shortly after Horstwood began raising objections and just before Horstwood moved for a show cause order, suggesting a deliberate attempt to frustrate enforcement. One cannot commit an act of contempt (starting unauthorized litigation), then assign the instrument of that contempt (the litigation) to a confederate, and claim absolution. The Court should see

the assignment gambit for what it is – an effort to evade responsibility – and firmly reject it. Adam cannot avoid contempt **simply by divesting nominal title** to the litigation he wrongfully initiated. The contemptuous conduct continues, and the Court's order can compel Adam to take steps to cease that conduct notwithstanding the assignment.

## VII. The IIL Assignment Is a Sham Transaction Among Bilzerian Family Entities, Undermining Its Credibility.

Not only is the assignment to IIL legally ineffective as a defense, but the nature of that assignment reveals it to be a **sham transaction** orchestrated within the Bilzerian family. Far from an arm's-length transfer to an independent third party, the assignment and the entities involved are intertwined with Adam's relatives and affiliates, casting doubt on the assignment's legitimacy and purpose.

**International Investments Ltd. (IIL)**, the assignee, is a St. Kitts company that is effectively controlled by Adam's immediate family. Corporate records show that **Terri Steffen** – Paul Bilzerian's wife and Adam's mother – is the Secretary of IIL. (Dkt. 1267, p. 48). IIL was originally owned by Adam, but now IIL's annual return filings further disclose that its sole (or principal) shareholder is **"Another Dimension Ltd."**, a company with the same address in St. Kitts as IIL.  In the indictment filed against Paul Bilzerian and others, pending in the Central District of California, the USA has alleged that IIL

> was a business entity based in St. Kitts and Nevis and originally incorporated in February 2007. Initially, International Investments was nominally owned by V.V. and defendant BILZERIAN's other son, A.B. [Adam]. Eventually, nominal ownership in International Investments was transferred to Another Dimension Ltd., which was owned by G.G.-P. In truth, G.G.-P. served as a straw owner for International Investments, which operated at the direction of and for the benefit of defendant BILZERIAN.

*USA v. Bilzerian,* Case No. 2:24-cr-00569-MEMF (Doc. 1). In other words, Adam assigned his litigation interests to a company run by **his mother** and owned by a family-linked entity – hardly a disinterested party.

The web does not end there. The **underlying loan** or cause of action being litigated in St. Kitts also ties back to a family entity. The record reflects that the St. Kitts lawsuits involve, inter alia, a promissory note dated June 17, 2016 from **The Everett Corporation** in the amount of $880,310 (Dkt. 1267, p. 23). The Everett Corporation is a Minnesota corporation controlled by the Bilzerian/Steffen family – its Chief Executive Officer is **Audrey Bilzerian**, and its registered agent is **Lois Steffen**, Adam's late grandmother, at the address of one of Adam's homes in Minnesota. See Business Record Details for The Everett Corporation, attached as KAH 1. In short, the money trail and corporate trail in this saga lead back to Bilzerian family entities at every turn: the transaction was originally papered between Adam and Horstwood, and Adam has been the figurehead claimant against Horstwood, until the claim on that debt was passed to another family vehicle (IIL/Another Dimension), in exchange for the assignment of a note from a corporation whose CEO is Audrey Bilzerian, Adam's wife.

These incestuous arrangements demonstrate that the assignment to IIL is a **sham designed to keep the litigation in the family's control while attempting to shield Adam (and Paul) from liability**. The assignment was not a good-faith sale to a bona fide outsider; it was a transfer from Adam's left hand to his right hand. All relevant actors – Adam, Terri Steffen, Audrey Bilzerian, etc. – are part of the Bilzerian inner circle and Adam's and Paul's immediate family. The Court should therefore view the assignment with extreme skepticism. When an assignment is merely among alter egos or insiders,

courts will disregard it rather than allow it to defeat judicial orders. *Cf. International Equity Inv. v. Opportunity Equity*, 441 F. Supp. 2d 552 (S.D.N.Y. 2006) (courts look past corporate formalities in contempt situations to prevent "end-runs" around injunctions by related entities).

In practical terms, because IIL is effectively controlled by Adam's family, Adam **does have the ability** to cause the St. Kitts litigation to end. The same close-knit group that arranged the transfer can surely orchestrate a termination of the suits. The only reason it has not happened is the Bilzerians' concerted decision not to comply. The Court should not indulge the fiction that IIL is an unrelated, independent party that inconveniently stands in the way of Adam's compliance. The reality is the opposite: IIL exists to do the family's bidding. The assignment changes nothing of substance except the paper title of the claimant. Accordingly, the Court should treat the assignment as a nullity for purposes of enforcing its order. Adam cannot hide behind a corporate cousin that is, for all intents and purposes, **himself**. The contempt power extends through such sham transactions to reach the real actors – here, Adam and those directing IIL's actions.

## VIII. The Assignment Is Invalid Under St. Kitts Law (English Law) Because One Cannot Assign a Cause of Action Founded on Illegal Acts.

Even under the law of St. Kitts (which follows English common law principles), the assignment to IIL is highly questionable and likely **invalid**, because one cannot assign a cause of action that is tainted by illegality or contravenes public policy. In English law, as in U.S. law, an assignee takes no greater rights than the assignor had. An assignor **cannot transfer what he does not possess** – *nemo dat quod non habet*. Here, Adam never had a rightful ability to pursue the Horstwood claims in St. Kitts in the first place: doing so was forbidden by the U.S. injunction that bound him and his father. In essence,

Adam's initiation of the lawsuits was an **illegal act** (in violation of a court order). Because Adam's prosecution of those claims was not lawful, he had no legitimate rights in the causes of action that he could convey to any assignee.

St. Kitts, as a common law jurisdiction, recognizes that an assignment cannot stand if it offends public policy – for example, one cannot assign a bare right to litigate a claim if doing so amounts to **maintenance or champerty** (i.e. trafficking in lawsuits), nor can one enforce an assignment that serves to perpetuate an illegal act. Assignments of a "cause of action" are generally prohibited when the assignment is effectively trying to assign the right to continue litigation that the assignor himself has no legal right to continue. *Cf. Trendtex Trading Corp. v. Credit Suisse*, [1982] AC 679 (HL) (English law voids assignments that are champertous or where assignee has no legitimate interest beyond litigation). Here, the cause of action against Horstwood was generated as part of an effort to circumvent a U.S. court order – a use of the courts that is against public policy. Allowing the assignment to IIL would sanction an abuse of process: it's an attempt to hand off a forbidden lawsuit to another corporate shell to keep it alive. English-derived law does not permit a claimant to assign an **illegal or void claim** to someone else. If a claim is founded on an illegal act or is being pursued in violation of an injunction, a court may refuse to recognize the validity of that claim or its assignment.

Furthermore, any St. Kitts court presented with the full picture – that the claim was filed in contravention of a United States court injunction – would have strong reason to question the propriety of the proceedings. Principles of international comity and the common law doctrine that "no court will assist a plaintiff who founds his cause of action on an immoral or illegal act" (the maxim *ex turpi causa non oritur actio*) should come into

play. Adam's entire case against Horstwood is predicated on conduct that a U.S. court has deemed unlawful for him to engage in. Transferring that case to IIL does not cleanse the taint. IIL, as assignee, can have no better claim than Adam had – and Adam's claim was null and void as a matter of the law governing him (the injunction). Thus, under fundamental legal principles, the assignment is **ineffective**. It is as if Adam attempted to assign a stolen property: the thief cannot pass good title. Here, Adam attempted to assign a lawsuit he had no legal right to maintain. He therefore passed nothing of enforceable value to IIL.

This point further solidifies why Adam's assignment defense fails. Not only is the assignment irrelevant to his duty to obey this Court, but the assignment itself is a legal nullity that cannot thwart the Court's order. Adam cannot manufacture a purported lack of capacity to comply by reference to an invalid transfer. The Court should hold that the assignment does not bar relief, and indeed that the assignment **cannot be used as a shield** since it is void for public policy/illegality reasons. Adam must answer for the contempt irrespective of that paper transaction.

## IX. Adam's Conduct Warrants Initiation of Criminal Contempt Proceedings.

Finally, given the foregoing – Adam's lack of any meritorious defense, his tacit admission of the contemptuous conduct, and the willful, strategic nature of his non-compliance – the Court should move forward with **criminal contempt** to uphold its authority. Adam's actions (and inactions) evince willfulness, the key element for criminal contempt. He knowingly aided in violating the 2001 Injunction by acting as Paul's instrument to file the St. Kitts suits, and even after the Court found him (through Paul) in contempt and ordered the suits withdrawn, he continued to resist compliance by raising

specious arguments and orchestrating family transfers. This behavior reflects a deliberate and contumacious disregard for the Court's order – the very definition of criminal contempt.

Criminal contempt is appropriate where a party's disobedience of a court order is **willful** and where punitive sanctions are needed to vindicate the court's authority and deter future misconduct. *See International Union, UMWA v. Bagwell*, 512 U.S. 821, 828 (1994). Here, the record demonstrates willful defiance. Adam (in concert with Paul) did not simply stumble into non-compliance; he engaged in a calculated plan to circumvent the injunction (using IIL and other entities) and persisted even after being put on notice. Even now, rather than promptly conforming to the Court's mandate, Adam seeks relief from the order and makes excuses for why he "cannot" obey – all while the impermissible foreign lawsuits remain active. Such conduct shows no remorse and no intent to purge the contempt. The usual remedy of civil contempt – coercing compliance – may be inadequate, since Adam maintains he will not or cannot comply. Thus, the more severe response of criminal contempt, which punishes past misconduct, is justified to send the unmistakable message that court orders are not optional.

It is also notable that this is not the first time Bilzerian family members or associates have forced the Court to resort to contempt proceedings. The history of this case is replete with examples of **evasive maneuvers** and refusal to abide by lawful orders. In 2009, this Court had to hold Paul and others in contempt for continuing vexatious litigation, a decision affirmed on appeal. Despite that, the pattern has continued – now with Adam as the frontman. The Court's 2001 Injunction was intended to prevent exactly this sort of repeat behavior, but the Bilzerians have attempted to push its limits. At this juncture,

initiating criminal contempt proceedings against Adam is warranted to **enforce respect for the Court's orders and to deter any future contempt by him or those acting in concert with him**. Without a strong punitive response, Adam may continue to flout the injunction (through IIL or new proxies) and drag out the illicit litigation, undermining the effectiveness of this Court's judgment.

## CONCLUSION

Accordingly, Horstwood respectfully urges the Court to grant the Verified Motion to Enforce the Court's Order, initiate criminal contempt proceedings against Adam Bilzerian, and deny Adam's request for relief from the January 24, 2025 Order. The integrity of this Court's injunction and orders must be upheld. Adam's opposition has only reinforced why contempt sanctions – indeed, criminal sanctions – are necessary: he has shown no credible defense, no meaningful compliance, and no contrition. The Court should therefore initiate criminal contempt proceedings against Adam, and ultimately impose appropriate penalties on Adam for his contumacious conduct. This response is essential to vindicate the authority of the Court, protect the due administration of justice, and finally bring an end to the protracted defiance of the 2001 Injunction.

**VERIFICATION**

I, Kevin Andrew Horstwood, hereby declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.  Executed on this 27th day of February, 2025.

KEVIN A. HORSTWOOD
Haven House, Grand Mal, St George,
Grenada W.I.
Tel; +1 473 534 0087
E-mail kevinhorstwood@yahoo.co.uk

**CERTIFICATE OF SERVICE**

I Kevin Andrew Horstwood hereby certify that I served a copy of the foregoing by regular or electronic mail on Paul A. Bilzerian P.O. Box 2086, Basseterre, St. Kitts; Michael J. Roessner, Esq., Securities and Exchange Commission, Division, Division of Enforcement, 100 F Street NE, Mail Stop 5631, Washington, DC 20549; G. Allen Dale, Law Offices of G. Allen Dale, PLLC, 555 13th Street NW, Suite 500 West, Washington, DC 20004; and David Z. Chesnoff and Richard A. Schonfeld, Chesnoff & Schonfeld, 520 S. 4th Street, Las Vegas, NV 89101-6593, on this 27th day of February, 2025.

KEVIN A. HORSTWOOD

KAH 1

## Business Record Details »

Minnesota Business Name
### The Everett Corporation

**Business Type**
Business Corporation (Domestic)

**MN Statute**
302A

**File Number**
676813400025

**Home Jurisdiction**
Minnesota

**Filing Date**
6/12/2013

**Status**
Active / In Good Standing

**Renewal Due Date**
12/31/2024

**Registered Office Address**
13236 County Road 103
Crosslake, MN 56442
USA

**Number of Shares**
1000000

**Registered Agent(s)**
Lois L Steffen

**Chief Executive Officer**
Audrey Bilzerian
37636 Dream Island Road
Crosslake, MN 56442–5644
United States

**Principal Executive Office Address**
37636 Dream Island Road
Crosslake, MN 56442
USA

Filing History

# Filing History

**Select the item(s) you would like to order:**    Order Selected Copies

| | Filing Date | Filing | Effective Date |
|---|---|---|---|
| ☐ | | | |
| ☑ | 6/12/2013 | Original Filing - Business Corporation (Domestic) (Business Name: The Everett Corporation) | |
| ☐ | 6/9/2015 | Administrative Dissolution - Business Corporation (Domestic) | |

| Filing Date | Filing | Effective Date |
|---|---|---|
| ☐ 7/6/2015 | Annual Reinstatement - Business Corporation (Domestic) | |
| ☐ 1/26/2022 | Administrative Dissolution - Business Corporation (Domestic) | |
| ☐ 9/15/2022 | Annual Reinstatement - Business Corporation (Domestic) | |

© 2024 Office of the Minnesota Secretary of State - Terms & Conditions

The Office of the Secretary of State is an equal opportunity employer

✉ Subscribe for email updates! Vulnerability Disclosure