# EXHIBIT 5

OBERDORFER, J. LFO

UNITED STATES DISTRICT COURT
for the
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>450 Fifth Street, N.W.<br>Washington, D.C. 20549<br>(202) 272-2945, | : : : : : | Civil Action<br>No. _____<br>**89- 1854** |
| Plaintiff, | : : : | |
| v. | : : : : | COMPLAINT FOR<br>INJUNCTIVE AND<br>OTHER EQUITABLE<br>RELIEF |
| PAUL A. BILZERIAN,<br>DAVID A. TALLANT,<br>BILZERIAN AND MACK ASSOCIATES,<br>HPC ACQUISITION CORPORATION,<br>EDWARD J. DEBARTOLO, SR.,<br>WILLIAM D. MOSES, and<br>RICHARD S. SOKOLOV, | : : : : : : : : | **FILED**<br><br>JUN 2 9 1989 |
| Defendants. | : : : | CLERK, U.S. DISTRICT COURT<br>DISTRICT OF COLUMBIA |

Plaintiff SECURITIES AND EXCHANGE COMMISSION (the "Commission") for its COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF (the "Complaint") alleges, upon information and belief, that:

1. Defendants Paul A. Bilzerian, David A. Tallant, Bilzerian and Mack Associates and HPC Acquisition Corporation, directly or



2

indirectly, personally or through direction of their agents, have engaged, are engaged or are about to engage in acts, transactions, practices and courses of business which constitute violations of the securities laws and regulations of the United States, as described more fully below.

2. Defendants Edward J. Debartolo, Sr., William D. Moses and Richard S. Sokolov, directly or indirectly, personally or through direction of their agents, have engaged, and, unless restrained and enjoined, are likely to engage in acts, transactions, practices and courses of business which constitute violations of the securities laws and regulations of the United States, as described more fully below.

<u>JURISDICTION AND VENUE</u>

3. The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and § 78u(e)] to permanently restrain and enjoin the defendants, and for other equitable relief.

4. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

5. Each of the defendants, directly or indirectly, has made use of means and instrumentalities of interstate commerce, of the mails or of the facilities of a national securities exchange, in connection with the acts, transactions, practices and courses of business alleged herein, certain of which have occurred within the District of Columbia.

3

6.   Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7.   Each defendant, unless permanently restrained and enjoined by this Court, will continue to engage in the acts, transactions, practices and courses of business alleged herein, and in acts, practices and courses of business of similar purport and object.

DEFENDANTS

8.   Defendant Paul A. Bilzerian ("Bilzerian") is a resident of Tampa, Florida.  Bilzerian is a private investor who has made several attempts to acquire public companies.  On June 9, 1989, Bilzerian was convicted by a jury in the United States District Court for the Southern District of New York of nine felony counts relating to his illegal conduct concerning the common stock of Cluett Peabody & Co., Inc., Hammermill Paper Co., Armco, Inc. and H.H. Robertson Co., certain of which conduct is covered by the allegations set forth below.  Bilzerian is scheduled for sentencing on August 16, 1989.

9.   Defendant David A. Tallant ("Tallant") is a resident of Carmichael, California.  Tallant is an attorney and member of the California bar.  He is a sole practitioner.

10.   Defendant Bilzerian and Mack Associates ("Associates") was a Delaware partnership, whose general partners were Bilzerian, Bilzerian Investors, L.P. and Mack Asset Co., L.P.  Associates acquired in excess of five (5) percent of the outstanding common stock of Hammermill Paper Company ("Hammermill") and was one of the

bidders in a July 25, 1986 tender offer for Hammermill common stock.

11. Defendant HPC Acquisition Company, Inc. ("HPC") was a Delaware corporation and an indirect wholly-owned subsidiary of Associates. HPC was incorporated on July 22, 1986 and was another of the bidders in a July 25, 1986 tender offer for Hammermill common stock.

12. Defendant Edward J. DeBartolo, Sr. ("DeBartolo, Sr.") is a resident of Boardman, Ohio. DeBartolo, Sr. is the Chairman of the Board of Directors of The Edward J. DeBartolo Corporation ("EJDC"), a private company that is among the world's largest developers and managers of regional shopping malls.

13. Defendant William D. Moses ("Moses") is a resident of Youngstown, Ohio. Moses is the Senior Vice President of Operations at EJDC.

14. Defendant Richard S. Sokolov ("Sokolov") is a resident of Boardman, Ohio. Sokolov is Senior Vice President-Development and General Counsel at EJDC.

<u>OTHER RELEVANT PERSONS AND ENTITIES</u>

15. Boyd L. Jefferies ("Jefferies") was at all relevant times the Chairman of the Board of Directors and Chief Executive Officer of Jefferies & Company, Inc. ("Jefferies & Company"), a broker-dealer registered with the Commission. On March 17, 1987, the Commission instituted a civil injunctive action and an administrative proceeding against Jefferies and Jefferies & Company, alleging violations of the antifraud, books and records,

5

beneficial ownership reporting requirements and other provisions of the federal securities laws. Without admitting or denying the allegations of the Commission, Jefferies and Jefferies & Company each consented to the entry of injunctions and the issuance of Commission orders sanctioning both the firm and Jefferies.

## I.

### CLUETT PEABODY & COMPANY, INC.

#### FIRST CLAIM - CLUETT

Bilzerian Violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rules 13d-1 and 13d-2 Thereunder, 17 C.F.R. §§ 240.13d-1 and 240.13d-2 -- Failure to Disclose Beneficial Ownership and False Statements on Schedule 13D.

16. Paragraphs 1 through 15 are realleged and incorporated by reference herein.

17. Cluett Peabody & Company, Inc. ("Cluett") is incorporated in New York. Cluett's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York and regional exchanges at all relevant times, until November 1985 when Cluett was acquired by a subsidiary of West Point-Pepperell, Inc. ("WPP").

18. On June 4, 1985, Bilzerian filed with the Commission, on behalf of himself, his general partner, William B. Brodovsky ("Brodovsky"), and the general partnership that he formed with Brodovsky, the Bilzerian and Brodovsky Partnership ("the Partnership"), a statement on Schedule 13D ("Schedule 13D") with respect to Cluett. As described in detail below, the Schedule 13D reported that Bilzerian, Brodovsky and the Partnership were the

6

beneficial owners of 9.9% of the outstanding common stock of Cluett. From July 12, 1985 through November 14, 1985, Bilzerian filed or caused the filing with the Commission of five amendments to the Schedule 13D.

19. From on or about June 4, 1985 and thereafter, Bilzerian made, and caused the Partnership to make, in the Schedule 13D and amendments thereto filed with respect to Cluett, untrue statements of material fact, omitted to state material facts necessary to make the statements that were made, not misleading, and omitted facts required to be stated by Section 13(d) of the Exchange Act, Rules 13d-1 and 13d-2 thereunder and Schedule 13D.

20. As more fully described below, the untrue statements, misstatements and omissions that Bilzerian made, and caused the Partnership to make or to fail to make and the failure to disclose accurately required information in the Schedule 13D and amendments thereto concerned, among other things, the following:

    (a)    the fact that Bilzerian had borrowed a substantial portion of the funds that had been used to purchase the Cluett securities reported in the Schedule 13D and amendments thereto from certain individual investors and the terms and conditions of those borrowings;

    (b)    the fact that Bilzerian was the beneficial owner of certain Cluett securities secretly purchased and held for him by Jefferies & Company;

(c)   the fact that Bilzerian's purpose in acquiring

Cluett securities was not to acquire the company

but to coerce the company's management to pay him

"greenmail" or to enter into an agreement with a

white knight; and

(d)   the fact that, on or about October 2, 1985, at the

latest, Bilzerian entered into a group arrangement

for the purpose of acquiring, holding, voting

and/or disposing of Cluett securities, which group

arrangement included DeBartolo, Sr., Moses and

Sokolov.

### Bilzerian's Secret Arrangements for Financing the Purchase of Cluett Common Stock

21.   From on or about April 12, 1985, through on or about May 28, 1985, Bilzerian raised approximately $8.75 million from a number of individual investors ("the Cluett Investors"). Bilzerian obtained these funds for the purpose of acquiring Cluett securities or in order to pay for Cluett securities he already had acquired.

22.   Bilzerian entered into contracts, arrangements and understandings with the Cluett Investors pursuant to which: (a) Bilzerian agreed to share evenly with the Cluett Investors the profits, if any, earned on the securities purchased with their funds; and (b) Bilzerian personally guaranteed that the Cluett Investors would not lose money and that their funds would be returned by a date certain.

8

23.    In an apparent attempt to conceal the identity and existence of the Cluett Investors and the terms of their loans with Bilzerian, Bilzerian funneled the approximately $8.75 million that he raised through a series of trusts that he created or caused to be created.  These trusts purported to provide Bilzerian with a fund of investment capital.

24.    Defendant DeBartolo, Sr. was one of the Cluett Investors.  DeBartolo, Sr. provided $2 million of the approximately $8.75 million Bilzerian used to purchase Cluett common stock.

25.    DeBartolo, Sr. made his $2 million investment on the same terms as the other Cluett Investors.  In addition to these terms, which are set forth in paragraph 22 above, DeBartolo, Sr. understood that his relationship to Bilzerian's acquisition of Cluett securities would not be disclosed publicly in any document or report filed with the Commission.

26.    Bilzerian concealed from and misrepresented in his filings with the Commission, and thus in his representations to the investing public, Cluett and Cluett's shareholders, the facts concerning the financial arrangements that he had entered into with the Cluett Investors.  Bilzerian filed, and caused the Partnership to file, an initial Schedule 13D on June 4, 1985. This Schedule 13D reported that Bilzerian, Brodovsky and the Partnership had purchased 581,000 shares of Cluett common stock and had acquired an option to purchase 210,000 Cluett shares (for $35 per share) for a total cost of approximately $17,821,016.  The

9

Schedule 13D disclosed that approximately $8.8 million of the total amount consisted of funds extended to the Partnership's margin account at Morgan Stanley & Co. The Schedule 13D, however, did not report the source of the remaining funds.

27. Bilzerian filed, and caused the Partnership to file, the first amendment to the Schedule 13D on July 12, 1985. This amendment reported that Bilzerian's "personal funds" represented approximately $9,021,016 of the total acquisition cost and that the remaining funds had been obtained through ordinary margin accounts. In fact, at least approximately $8.75 million of the $9,021,016 that Bilzerian reported as "personal funds" had been obtained by him from the Cluett Investors in the manner and under the terms discussed in paragraphs 21 through 25 above, and were not Bilzerian's personal funds.

28. Neither the initial Schedule 13D filed by Bilzerian, Brodovsky and the Partnership nor any of the subsequent five amendments thereto disclosed the true source of funds or the contracts, arrangements and understandings between Bilzerian and the Cluett Investors that are set forth in paragraphs 21 through 25 above.

Bilzerian's Undisclosed Purpose For the Stock Acquisition

29. The Schedule 13D filed on June 4, 1985, reported that Bilzerian, Brodovsky and the Partnership had acquired Cluett common stock in order "to exercise influence on the management of [Cluett] . . . principally with a view to proposing and effecting a

leveraged buyout, with the participation of [Cluett] management, of the entire equity interest of [Cluett]."

30. In fact, Bilzerian's purpose in acquiring beneficial ownership of in excess of five percent of Cluett common stock was to allow him to appear to be a credible takeover threat and thereby induce Cluett's management to pay him and the Partnership greenmail or to enter into an acquisition arrangement with a friendly buyer (a so-called "white knight").

Bilzerian's Secret Accumulation Arrangement
With Jefferies & Company

31. On or about May 21, 1985, Bilzerian entered into an agreement with Michael Landy ("Landy"), a Senior Vice President of Institutional Sales at Jefferies & Company, pursuant to which Jefferies & Company would accumulate the common stock of Cluett for Bilzerian's benefit. Under this agreement, Jefferies & Company would acquire the Cluett shares and, at a later date, Bilzerian would "buy" the shares from Jefferies & Company and pay the firm its cost to acquire the stock, plus its cost to carry the stock and commissions.

32. In accordance with this arrangement, from May 21 through May 27, 1985, Jefferies & Company acquired 302,000 shares of Cluett in a firm account for Bilzerian.

33. As a result of the agreement described in paragraph 31 above, Bilzerian became the beneficial owner of in excess of five percent of the outstanding common stock of Cluett on May 21, 1985.

11

34.   Bilzerian, as the beneficial owner of more than five percent of the common stock of Cluett, had an obligation to file with the Commission a Statement on Schedule 13D with respect to his holdings no later than ten days after his beneficial ownership exceeded five percent, or by May 31, 1985.

35.   Bilzerian, individually and on behalf of the Partnership, failed to file a Schedule 13D until June 4, 1985.

36.   On or about May 28, 1985, Bilzerian, on behalf of the Partnership, purchased from Jefferies & Company the 302,000 shares that had been accumulated in the manner described in paragraphs 31 and 32 above, for an average price of $29.97 per share.  This average price per share represented Jefferies & Company's cost to acquire and carry the shares and a six cent per share commission.

37.   The Schedule 13D and the amendments thereto also failed to report the above-described arrangement with Jefferies & Company and falsely reported a purchase of 302,000 shares of Cluett common stock as having occurred on May 28, 1985.

### The Group Arrangement

38.   From May through August 1985, defendants DeBartolo, Sr., Moses and Sokolov acquired and/or controlled 280,900 shares of Cluett common stock, as noted in paragraphs 93 through 95 below. The majority of these shares were acquired by DeBartolo, Sr.

39.   On or about August 26, 1985, Bilzerian requested that DeBartolo, Sr. provide approximately $20 million in additional financing for a tender offer for Cluett.  DeBartolo, Sr. declined at that time to provide the financing.

12

40.  On or about October 2, 1985 at the latest, Bilzerian entered into an arrangement, agreement or understanding with DeBartolo, Sr., Moses and Sokolov pursuant to which the shares of Cluett common stock held by DeBartolo, Sr., Moses and Sokolov ("the Shares") were available to be used by Bilzerian to further his effort to launch a takeover of Cluett.

41.  At the time when DeBartolo, Sr., Moses and Sokolov agreed to make available their Cluett shares to Bilzerian, they owned, respectively, 216,900 shares, 49,000 shares and 5,000 shares of Cluett common stock.

42.  Bilzerian did not amend, or cause the Partnership to amend, the Schedule 13D on file with the Commission to reflect the arrangement described in paragraph 40 above.

43.  On or about October 9, 1985, Bilzerian proposed to Moses that the Shares be reported to be sold to him at $38 per share with a forty-five day delayed settlement.  Bilzerian further proposed that, notwithstanding the reported sale price, the transfer of the Shares would be subject to two further conditions: (a) that if Bilzerian announced a tender offer for Cluett at a price higher than $38 per share the individual owners of the Shares automatically would receive the higher price; and (b) that if Bilzerian's tender offer bid was "topped" by a higher bid the transaction would be canceled so that the Shares could be sold to the higher bidder at the higher price.  Bilzerian then falsely represented himself to the Commission and to the investing public to be the owner of the Shares at no cost to himself.

13

44. On or about October 9, 1985, Bilzerian understood that 347,567 shares of Cluett common stock were subject to the arrangement described in paragraphs 40 through 43 above.

45. On or about October 10, 1985, Moses told Bilzerian that the number of shares subject to the arrangement described in paragraphs 40 through 43 above had been overcounted by 66,667 shares. Notwithstanding this material discrepancy, Bilzerian told Moses to place an order to sell 347,567 shares of Cluett common stock at a price of $38 per share with a broker to be selected by Bilzerian.

46. As previously agreed, on or about October 14, 1985 Moses placed an order to sell 347,567 shares of Cluett common stock at a price of $38 per share with a broker selected by Bilzerian, and Bilzerian placed an order to buy the same number of shares of Cluett at the same price with the same broker. Both orders were subject to a forty-five day settlement period. Bilzerian publicly reported a purchase of 347,567 shares of Cluett common stock at $38 per share.

47. As discussed in detail below, on October 15, 1985 Bilzerian, Brodovsky and the Partnership filed with the Commission a tender offer statement on Schedule 14D-1 announcing a tender offer for all of the outstanding shares of Cluett common stock at $40 per share. This filing purported to amend the Schedule 13D referred to in paragraph 26 above that Bilzerian previously had caused to be filed. This amendment concealed the arrangement

14

described in paragraphs 40 through 43 above and materially misrepresented the nature of the transaction involving the Shares.

48. Between October 16, 1985 and November 3, 1985, Bilzerian entered into another arrangement or understanding with another of the Cluett Investors to acquire sufficient shares of Cluett common stock to make up for the shortfall of 66,667 Shares, referred to in paragraph 45 above.

49. Pursuant to this arrangement, on or about November 4, 1985, 162,900 shares of Cluett common stock were transferred into a brokerage account in the name of the Partnership. On or about November 12, 1985, Bilzerian sold 96,233 of these shares into the market.

50. The Schedule 13D filed by Bilzerian, Brodovsky and the Partnership never was amended to reflect the acquisition of the 162,900 shares or to reflect the disposition of the 96,233 shares referred to in paragraph 49 above.

51. The Schedule 13D and amendments thereto filed by Bilzerian, Brodovsky and the Partnership contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 13(d), Rules 13d-1 and 13d-2 thereunder, and Schedule 13D, including, among others, the following:

> (a) the Schedule 13D failed to disclose that Bilzerian borrowed approximately $8.75 million of the approximately $17 million purchase price (which

15

included a reported $8.8 million in margin loans) of the Cluett securities listed in the initial Schedule 13D and failed to describe the terms of the loan transactions and the names of the parties thereto (Schedule 13D, Item 3);

(b)   Amendment 1 to the Schedule 13D falsely identified the source of funds used to acquire Cluett securities as Bilzerian's personal funds;

(c)   the Schedule 13D failed to disclose the contracts, arrangements, understandings and relationships that Bilzerian had entered into with the Cluett Investors pursuant to which the Cluett Investors were entitled to one-half of the profits earned on the Cluett securities purchased with the funds that they had provided and pursuant to which such investors received personal guarantees from Bilzerian that they would not lose money on their investments (Schedule 13D, Items 3, 5 and 6);

(d)   the Schedule 13D falsely reported that the purpose of acquiring Cluett stock was to attempt a leveraged buyout when, in fact, the purpose was to pose a credible takeover threat in order to force Cluett management to pay greenmail or to seek out a white knight (Schedule 13D, Item 4);

(e)   the Schedule 13D was filed with the Commission more then ten days after Bilzerian and the Partnership

16

became the beneficial owners of in excess of five percent of the securities of Cluett;

(f)     the Schedule 13D failed to disclose the existence of a group formed on or about October 2, 1985, at the latest for the purpose of acquiring, voting, holding or disposing of Cluett securities, the identities of DeBartolo, Sr., Moses and Sokolov as members of the group, and the number of Cluett shares beneficially owned by each of the undisclosed group members (Schedule 13D, Items 2, 5 and 6);

(g)     the Schedule 13D falsely stated that there were no contracts, arrangements, understandings or relationships between the filing persons and any other person with respect to Cluett common stock, when the contracts, arrangements, understandings and relationships described in paragraphs 21 through 50 above were in existence;

(h)     the Schedule 13D was not amended to report the acquisition on or about November 4, 1985 of 162,900 shares of Cluett common stock as described in paragraph 49; and

(i)     the Schedule 13D was not amended to report the disposition on or about November 12, 1985 of 96,233 shares of Cluett common stock as described in paragraph 49.

17

52.  By reason of the foregoing, Bilzerian violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

### SECOND CLAIM - CLUETT

Bilzerian Violated Section 14(d) of the Exchange
Act, 15 U.S.C. § 78n(d), and Rules 14d-3 and 14d-6
Thereunder, 17 C.F.R. §§ 240.14d-3 and 240.14d-6
--False and Misleading Tender Offer Statement

Bilzerian's Other Undisclosed Tender Offer Arrangements

53.  Paragraphs 1 through 52 are realleged and incorporated by reference herein.

54.  On or about October 7, 1985, DeBartolo, Sr. agreed to loan Bilzerian $2 million to be used by Bilzerian solely to pay expenses related to the planned tender offer for Cluett.

55.  From on or about October 7 through on or about October 28, 1985, Bilzerian used the $2 million loaned by DeBartolo, Sr. to pay commitment fees and other expenses related to the October 15, 1985 tender offer for Cluett.

56.  Bilzerian did not disclose, or cause to be disclosed, the $2 million loan discussed in paragraphs 54 and 55 above, in any filing made with the Commission.

Bilzerian's False and Misleading Tender Offer Statement

57.  On October 15, 1985, CPC Acquisition Company ("CPC"), an entity controlled by Bilzerian, filed a tender offer statement on Schedule 14D-1 with the Commission.  The Schedule 14D-1 stated that the purpose of the tender offer to acquire all of the outstanding common stock of Cluett at $40 per share cash was "to acquire the entire equity interest" in Cluett.

18

58.   The Schedule 14D-1 reported that CPC beneficially owned 1,952,867 shares of Cluett common stock, including 347,567 shares that reportedly had been acquired on October 14, 1985 "in an open market transaction for an aggregate purchase price of $13,224,924."  The Schedule 14D-1 reported that this purchase price, which represented a per share price of $38, had been paid "utilizing capital contributions from the partners."

59.   On or about November 4, 1985, Cluett entered into an agreement with West Point-Pepperell, Inc. ("WPP"), whereby WPP agreed to purchase Cluett for a price of $41 per share to be paid in a combination of cash and securities.  WPP also agreed to pay $40 cash for 1,138,567 of the shares of Cluett common stock that Bilzerian had publicly reported that he and the Partnership owned in exchange for Bilzerian and the Partnership agreeing to cease their tender offer.

60.   In fact, 280,900 of the shares of Cluett common stock that Bilzerian represented to WPP that he owned were the shares subject to the arrangement described in paragraphs 40 through 43 above.  By entering into the agreement with WPP, Bilzerian had committed himself to deliver the shares held by DeBartolo, Sr., Moses and Sokolov.  Pursuant to the terms of the arrangement described in paragraphs 40 through 43 above, Bilzerian also was obligated to pay DeBartolo, Sr., Moses and Sokolov $40 per share for their shares, rather than the $38 per share referred to in paragraph 43 above, and reported in the Schedule 14D-1 referred to in paragraph 47 above.

19

61.  On or about November 4, 1985, Bilzerian communicated to Moses and Sokolov his plan to conceal further the existence of the arrangement described in paragraphs 40 through 43 above. Specifically, Bilzerian said that he would draft and mail to DeBartolo, Sr. a letter and promissory note that purported to pay DeBartolo, Sr. $38 per share (the price that had been reported publicly in the Schedule 14D-1 filed by Bilzerian) for 280,900 shares of Cluett.  Bilzerian told Moses and Sokolov that the $40 per share price that actually would be paid for the Shares would not be mentioned in the letter or the promissory note, and the $2 per share difference between the actual price of $40 per share paid for the Shares and the publicly reported sales price of $38 per share would be paid to DeBartolo, Sr., Moses and Sokolov separately.  The letter and promissory note were sent by Bilzerian on or about November 4, 1985.

62.  On or about December 5, 1985, Bilzerian paid DeBartolo, Sr., Moses and Sokolov $40 per share for the 280,900 shares of Cluett common stock discussed above.

63.  The documents described in paragraph 61 above were created and sent by Bilzerian to appear to track the public disclosure in the Schedule 14D-1 that Bilzerian had acquired a substantial block of Cluett in October for $38 per share.

64.  In or about December 1985, Bilzerian repaid DeBartolo, Sr. and the other Cluett Investors the full amount of their initial loans plus an amount equal to one-half of the profits that

20

had been earned on the shares of Cluett common stock that had been purchased by Bilzerian with the borrowed funds.

65. The Schedule 14D-1 that Bilzerian caused CPC to file with the Commission contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 14(d) of the Exchange Act, Rules 14d-3 and 14d-6 thereunder and Schedule 14D-1, including, among others, the following:

    (a)    the Schedule 14D-1 falsely represented that the purpose of the tender offer was to acquire an equity interest in Cluett when, in fact, the purpose of the tender offer was to induce Cluett to pay greenmail or to negotiate to be acquired by a white knight;

    (b)    the Schedule 14D-1 omitted to report that $2 million had been borrowed from DeBartolo, Sr. for the purpose of obtaining funding for the tender offer;

    (c)    the Schedule 14D-1 falsely reported that 347,567 shares of Cluett had been purchased on October 14, 1985, when in fact:

        (1)    the transaction was not a sale because Bilzerian did not intend to purchase the Shares unless certain contingencies occurred;

21

    (2)   the price per share, if a sale were to occur, was $40 not the $38 per share reported in the Schedule 14D-1;

    (3)   the transaction involved 280,900 shares of Cluett common stock not the 347,567 shares reported in the Schedule 14D-1;

    (4)   the transaction was a privately negotiated transaction and not an open market acquisition as reported in the Schedule 14D-1; and

    (5)   no capital contribution had been made by Bilzerian or his partners to pay for the 347,567 shares of Cluett as reported in the Schedule 14D-1.

66. By reason of the foregoing, Bilzerian violated Section 14(d) of the Exchange Act [15 U.S.C. § 78n(d)] and Rules 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.14d-3 and 240.14d-6].

<u>THIRD CLAIM - CLUETT</u>

Bilzerian Violated Section 10(b) of the Exchange Act,
15 U.S.C. § 78j(b), and Rule 10b-5 Thereunder, 17
C.F.R. § 240.10b-5--Securities Fraud

67. Paragraphs 1 through 66 are realleged and incorporated by reference herein.

68. Bilzerian, directly or indirectly, in connection with the purchase and sale of the securities of Cluett, by the use of means and instrumentalities of interstate commerce, the mails, or facilities of a national securities exchange, employed devices,

22

schemes or artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

69. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 13D and amendments thereto that he filed and caused the Partnership to file with respect to the securities of Cluett contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading.

70. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 14D-1 with respect to the securities of Cluett that he caused CPC to file contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading.

71. In addition to the foregoing, Bilzerian lied to the staff of the Commission while he was under oath and sworn to tell the truth in investigative testimony concerning the existence and nature of these contracts, arrangements and understandings concerning Cluett.

72. By reason of the foregoing, Bilzerian violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM - CLUETT

Bilzerian Violated Section 14(e) of the
Exchange Act, 15 U.S.C. § 78n(e)--Tender Offer Fraud

73. Paragraphs 1 through 72 are realleged and incorporated by reference herein.

74. As detailed above, Bilzerian, directly or indirectly, in connection with a tender offer or request or invitation for tenders of Cluett securities, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in fraudulent, deceptive and manipulative acts and practices.

75. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 14D-1 with respect to the securities of Cluett that he caused CPC to file, contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

76. By reason of the foregoing, Bilzerian violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)].

24

FIFTH CLAIM - CLUETT

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 17(a)(1) of the Exchange Act,
15 U.S.C. § 78q(a)(1), and Rule 17a-3 Thereunder,
17 C.F.R. § 240.17a-3 -- False Books and Records

77. Paragraphs 1 through 76 are realleged and incorporated by reference herein.

78. Jefferies & Company, as a registered broker-dealer, must make and keep such records as the Commission by rule proscribes as necessary and appropriate in the public interest or for the protection of investors, including accurately identifying, among other things, the account for which each transaction is made and the true beneficial owner of each security.

79. Jefferies & Company, as a result of the secret accumulation agreement with Bilzerian described in paragraphs 31 through 37 above, failed to reflect accurately on its books and records, among other things, Bilzerian's beneficial ownership of the 302,000 Cluett shares accumulated and held by the firm, in violation of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

80. Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve violations of Section 17(a)(1) of the Exchange Act and Rule 17a-3 thereunder, and substantially assisted in the commission of those violations.

81. By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 17(a)(1) of the

25

Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

### SIXTH CLAIM - CLUETT

Bilzerian Violated Section 7(f) of the Exchange Act, 15 U.S.C. § 78g(f), and Regulation X Thereunder, 12 C.F.R. § 224.1 et seq.--Margin Violations

82. Paragraphs 1 through 81 are realleged and incorporated by reference herein.

83. Pursuant to the arrangement described in paragraphs 31 through 37 above, Bilzerian caused credit to be extended and obtained, and received and enjoyed the beneficial use of a loan and extension of credit for the purpose of purchasing or carrying Cluett securities in contravention of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

84. By reason of the foregoing, Bilzerian violated Section 7(f) of the Exchange Act [15 U.S.C. § 78g(f)] and Regulation X thereunder [12 C.F.R. § 224.1 et seq.].

### SEVENTH CLAIM - CLUETT

Bilzerian Aided and Abetted Jefferies & Company's Violations of Section 7(c) of the Exchange Act, 15 U.S.C. § 78g(c), and Regulation T Thereunder, 12 C.F.R. § 220.1 et seq.--Margin Violations

85. Paragraphs 1 through 84 are realleged and incorporated by reference herein.

86. Pursuant to the arrangement described in Paragraphs 31 through 37 above, Jefferies & Company, directly or indirectly, extended and maintained credit, and arranged for the extension and maintenance of credit, to Bilzerian for the purchase of Cluett

securities in violation of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

87. By virtue of its unlawful extension of credit to Bilzerian, Jefferies & Company violated Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

88. Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or involved violations of Section 7(c) of the Exchange Act and Regulation T, and substantially assisted in the commission of those violations.

89. By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

### EIGHTH CLAIM - CLUETT

DeBartolo, Sr., Moses and Sokolov Violated Sections 10(b) and 13(d) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(d), and Rules 10b-5 and 13d-1 thereunder, 17 C.F.R. §§ 240.10b-5 and 240.13d-1, and Aided and Abetted Bilzerian's Violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e), and Rules 10b-5, 13d-1, 13d-2, 14d-3 and 14d-6 Thereunder, 17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2, 240.14d-3 and 240.14d-6 -- Reporting/Antifraud Violations

90. Paragraphs 1 through 76 are realleged and incorporated by reference herein.

91. As detailed above, the filing of the initial Schedule 13D and the amendments thereto filed by Bilzerian with respect to Cluett violated Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 in that, among other things, neither the Schedule 13D

27

nor the amendments disclosed the true source of funds used to acquire the Cluett securities, the interest of the Cluett Investors in Bilzerian's disclosed holdings of Cluett securities and the arrangements, agreements and understandings that Bilzerian had entered into with the Cluett Investors.

92. DeBartolo, Sr. and Moses knew or were reckless in not knowing of these violations by Bilzerian of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder, and, by arranging for and providing funds to Bilzerian as described above, substantially assisted in the commission of those violations.

93. Following the filing of Bilzerian's Schedule 13D, and with knowledge of, or in circumstances where he should have known of, the materially false and misleading statements contained therein, DeBartolo, Sr. purchased 186,900 shares of Cluett common stock from June 28, 1985 through August 1, 1985. DeBartolo, Sr. realized a profit of $613,075 on the sale of these shares.

94. DeBartolo, Sr. also suggested to Sokolov that Sokolov purchase additional shares of Cluett stock. From August 1 through August 5, 1985, Sokolov purchased 5,500 shares of Cluett common stock. DeBartolo, Sr. provided the funds to Sokolov to make these purchases. Sokolov realized a profit of $11,625 upon the sale of these shares.

95. Following the filing of Bilzerian's Schedule 13D, and with knowledge of, or in circumstances where he should have known of, the materially false and misleading statements contained therein, Moses purchased 30,000 shares of Cluett common stock from

28

July 31 through August 2, 1985. Moses realized a profit of $76,475 upon the sale of these shares.

96. As set forth above in paragraphs 38 through 46 above, on or about October 2, 1985, at the latest, DeBartolo, Sr., Moses and Sokolov formed a group with Bilzerian for the purpose of acquiring, holding, voting or disposing of Cluett securities.

97. DeBartolo, Sr., Moses and Sokolov did not file a Schedule 13D disclosing their group arrangement with Bilzerian with respect to Cluett securities or the number of shares of Cluett common stock beneficially owned by the group members.

98. As described in paragraph 43 above, DeBartolo, Sr., Moses and Sokolov entered into an arrangement whereby the 280,900 shares of Cluett common stock acquired and/or controlled by them would be made available to Bilzerian at a reported price of $38 per share.

99. DeBartolo, Sr., Moses and Sokolov knew or were reckless in not knowing that Bilzerian's false and misleading description in the Schedule 14D-1 of the arrangement described in paragraphs 40 through 43 above violated Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act and Rules 10b-5, 13d-2 and 14d-3 thereunder, and that they substantially assisted in the commission of those violations, and thereby aided and abetted Bilzerian's violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act and Rules 10b-5, 13d-2, 14d-3 and 14d-6 thereunder.

100. DeBartolo, Sr.'s, Moses' and Sokolov's knowing or reckless failure to file a Schedule 13D with respect to their

29

beneficial ownership of more than five percent of the outstanding common stock of Cluett, as described in paragraphs 96 and 97, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

101. By reason of the foregoing, DeBartolo, Sr., Moses and Sokolov violated Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(d)] and Rules 10b-5 and 13d-1 thereunder [17 C.F.R §§ 240.10b-5 and 240.13d-1], and aided and abetted Bilzerian's violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e)], and Rules 10b-5, 13d-2, 14d-3 and 14d-6 thereunder, [17 C.F.R. §§ 240.10b-5, 240.13d-2, 240.14d-3 and 240.14d-6], and DeBartolo, Sr. and Moses aided and abetted Bilzerian's violations of Rule 13d-1 under the Exchange Act [17 C.F.R. § 240.13d-1].

II.

## HAMMERMILL PAPER COMPANY

### FIRST CLAIM - HAMMERMILL

Bilzerian, Bilzerian & Mack Associates and HPC Acquisition Company Violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-1 Thereunder, 17 C.F.R. § 240.13d-1--Failure to Timely Disclose Beneficial Ownership and False Statements on a Schedule 13D

102. Paragraphs 1 through 15 are realleged and incorporated by reference herein.

103. Hammermill is incorporated in Pennsylvania. Hammermill's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York and regional stock exchanges at all relevant times,

30

until August 1986 when Hammermill was acquired by International Paper Company.

104. On or about July 25, 1986, Bilzerian filed with the Commission, on behalf of Bilzerian and Mack Associates ("Associates"), a partnership of which he was the managing general partner, and HPC Acquisition Company ("HPC"), an indirect wholly-owned subsidiary of Associates, a combined Schedule 13D and 14D-1 with respect to Hammermill ("Schedule 13D/14D-1"). The Schedule 13D/14D-1 announced that HPC and Associates were making a tender offer for all of the outstanding shares of Hammermill common stock at $52 per share in cash. As described in detail below, the Schedule 13D/14D-1 reported that HPC and Associates were the beneficial owners of 19.6% of the outstanding common stock of Hammermill.

105. From on or about July 25, 1986 and thereafter, Bilzerian made, and caused HPC and Associates to make, in the Schedule 13D/14D-1, untrue statements of material fact, omitted to state material facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 13(d) of the Exchange Act, Rule 13d-1 thereunder and Schedule 13D.

106. As described more fully below, the false statements and omissions that Bilzerian made and caused Associates and HPC to make or to fail to make and the failure to disclose accurately required information in the Schedule 13D/14D-1 concerned, among other things, the following:

31

  (a) the fact that Bilzerian borrowed a substantial portion of the funds that had been used to purchase the Hammermill securities reported in the Schedule 13D/14D-1 from certain individual investors and the terms and conditions of those borrowings; and

  (b) the fact that Bilzerian was the beneficial owner of certain Hammermill securities secretly purchased and held for him by Jefferies & Company.

Bilzerian's Undisclosed Arrangements for
Financing the Purchase of Hammermill Common Stock

107. From on or about February 25, 1986 through on or about July 11, 1986, Bilzerian raised approximately $15 million from a number of individual investors ("the Hammermill Investors"). Bilzerian obtained these funds for the purpose of acquiring Hammermill securities or in order to pay for Hammermill securities he already had acquired.

108. Bilzerian entered into contracts, arrangements and understandings with the Hammermill Investors pursuant to which: (a) Bilzerian agreed to share evenly with the Hammermill Investors the profits, if any, earned on the securities purchased with their funds; (b) Bilzerian agreed to provide to the Hammermill Investors the dividends earned, if any, on the securities purchased with their funds; and (c) Bilzerian personally guaranteed that the Hammermill Investors would not lose money and that their funds would be returned by a date certain.

109.  In an apparent attempt to conceal the identities of the Hammermill Investors and the terms of their loans with Bilzerian, Bilzerian funneled the approximately $15 million that he raised from the Hammermill Investors through trusts entered into between defendant Tallant and the Hammermill Investors (the "Tallant Trusts").  These trusts purported to provide Tallant with unrestricted investment authority.  In fact, Tallant arranged with Bilzerian to transfer immediately to Bilzerian all contributions made by the Hammermill Investors to the Tallant Trusts.

110.  DeBartolo, Sr. was one of the Hammermill Investors. DeBartolo, Sr. provided $8 million of the approximately $15 million that Bilzerian raised through the Tallant Trusts.

111.  In addition to the contracts, arrangements and under-standings set forth in paragraph 108 above, DeBartolo, Sr. understood that his relationship to Bilzerian's acquisition of Hammermill securities would not be disclosed publicly in any document or report filed with the Commission.

112.  On or about September 1986, Bilzerian repaid the Hammermill Investors the full amount of their investments plus an amount equal to approximately one-half of the profits that had been earned on the shares of Hammermill common stock that had been purchased by Bilzerian and Associates with the Hammermill Investors' funds.

113.  Bilzerian concealed from and misrepresented in his filings with the Commission, and thus in his representations to the investing public, Hammermill and Hammermill's shareholders,

the facts concerning the financial arrangements that he had entered into with the Hammermill Investors. Bilzerian caused Associates and HPC to file a combined Schedule 13D/14D-1 on July 25, 1986. This Schedule reported that HPC and Associates had acquired 3,281,250 shares of Hammermill common stock for a total cost of approximately $153,738,180 (settlement on 1,674,700 of these shares, at a total cost of approximately $87,084,400.00, was delayed until seven days after the termination of the tender offer). The Schedule 13D/14D-1 represented that at least $10 million of the approximately $66,653,780 that actually had been expended for the purchase of the Hammermill shares had been obtained from Bilzerian's "personal funds." In fact, these funds had been obtained in the manner and under the terms discussed in paragraphs 107 through 111 above, and were not Bilzerian's personal funds.

114. Neither the Schedule 13D/14D-1 filed by HPC and Associates nor any of the amendments thereto disclosed the contracts, arrangements and understandings between Bilzerian and the Hammermill Investors that are set forth above in paragraphs 107 through 113.

### Bilzerian's Secret Accumulation Arrangement with Jefferies & Company

115. On or about June 26, 1986, Bilzerian entered into an agreement with Jefferies, the then Chairman of Jefferies & Company, pursuant to which Jefferies & Company would accumulate Hammermill common stock for Bilzerian's benefit. Under this agreement, Jefferies & Company would accumulate Hammermill and, at

a later date, Bilzerian would "buy" the shares from Jefferies & Company and pay the firm its cost to acquire the stock, plus its cost to carry the stock and commissions.

116. In accordance with this arrangement, from June 26 through July 16, 1986, Jefferies & Company acquired 551,000 shares of Hammermill common stock in a firm account for Bilzerian.

117. As a result of the above-described arrangement, on June 27, 1986, Bilzerian became the beneficial owner of in excess of five percent of the outstanding common stock of Hammermill.

118. Bilzerian, as the beneficial owner of more than five percent of the common stock of Hammermill, had an obligation to file with the Commission a Statement on Schedule 13D with respect to his holdings no later than ten days after his beneficial ownership exceeded five percent, or by July 7, 1986.

119. Bilzerian, individually and on behalf of Associates and HPC, failed to file a Schedule 13D with respect to Hammermill until July 25, 1986.

120. On or about July 21, 1986, Bilzerian, on behalf of himself and Associates, purchased from Jefferies & Company the 551,000 shares that Jefferies & Company had accumulated in the manner described above for an average price of $42.78 per share. This price per share included Jefferies & Company's cost to acquire the shares, its cost to carry them and a commission. The $42.78 was below the market price for the day: on July 21, 1986 Hammermill common stock traded at a high of $45.875 per share, a low of $44.875 per share and closed at $45 per share. Jefferies &

35

Company, at Bilzerian's request, reported the trade as having occurred after 4:30 Eastern Standard Time (after the stock exchanges closed) so that it would not be reported on the consolidated tape, in an apparent attempt to conceal this transaction.

121. The Schedule 13D/14D-1 filed by Associates and HPC failed to report the above-described arrangement with Jefferies & Company and falsely reported a purchase of 551,000 shares of Hammermill common stock as having occurred on July 21, 1986.

122. From July 8, 1986 (the day after a Schedule 13D should have been filed) until July 25, 1986 (when the Schedule 13D actually was filed), Bilzerian caused HPC and Associates to acquire an additional 2,148,100 shares of Hammermill common stock at an average price of approximately $50.00 per share. HPC and Associates received $64.50 per share for each of these shares on or about September 10, 1986, when the shares were tendered to International Paper Company. This amounted to an illicit profit of approximately $31,016,918.

Bilzerian's False and Misleading Tender Offer Statement

123. The Schedule 13D/14D-1 that Bilzerian filed on behalf of HPC and Associates contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be included therein by Section 13(d), Rule 13d-1 thereunder and Schedule 13D, including, among others, the following:

36

(a)    the Schedule 13D/14D-1 failed to include disclosure that approximately $15 million of the total purchase price of the Hammermill securities listed in the Schedule 13D/14D-1 had been borrowed by Bilzerian, and it failed to describe the terms of the loan transactions and the names of the parties thereto (Schedule 13D, Item 3);

(b)    the Schedule 13D/14D-1 falsely identified the source of at least $10 million of funds used to acquire Hammermill securities as Bilzerian's personal funds;

(c)    the Schedule 13D/14D-1 failed to disclose the contracts, arrangements, understandings and relationships that Bilzerian had entered into with the Hammermill Investors pursuant to which the Hammermill Investors were entitled to one-half of the profits earned on the Hammermill securities purchased with the funds that they provided and to receive any dividends declared on the securities purchased with the funds that they provided and were personally guaranteed by Bilzerian against any loss on their investments (Schedule 13D, Items 3, 5 and 6);

(d)    the Schedule 13D/14D-1 was filed with the Commission more then ten days after Bilzerian, HPC and Associates became the beneficial owners of in

37

excess of five percent of the securities of Hammermill;

(e) the Schedule 13D/14D-1 falsely stated that there were no contracts, arrangements, understandings or relationships with respect to the Hammermill securities when, in fact, the contracts, arrangements, understandings and relationships described in paragraphs 103 through 123 were in existence.

124. As a result of the foregoing, Bilzerian, HPC and Associates violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. §§ 240.13d-1].

## SECOND CLAIM - HAMMERMILL

Bilzerian, HPC and Associates Violated Section 14(d) of the Exchange Act, 15 U.S.C. § 78n(d), and Rules 14d-3 and 14d-6 Thereunder, 17 C.F.R. §§ 240.14d-3 and 240.14d-6--False and Misleading Tender Offer Statement

125. Paragraphs 1 through 15 and 102 through 124 are realleged and incorporated by reference herein.

126. As enumerated in Paragraph 123 above, the Schedule 13D/14D-1 that Bilzerian caused HPC and Associates to file contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 14(d) of the Exchange Act [15 U.S.C. § 78m(d)], Rules 14d-3 and 14d-6 thereunder and Schedule 14D-1 [17 C.F.R. §§ 240.14d-3, 240.14d-6 and 240.14d-100].

38

127. By reason of the foregoing, Bilzerian, HPC and Associates violated Section 14(d) of the Exchange Act [15 U.S.C. § 78n(d)] and Rules 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.14d-3 and 240.14d-6].

### THIRD CLAIM - HAMMERMILL

Bilzerian, HPC and Associates Violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 Thereunder, 17 C.F.R. § 240.10b-5--Securities Fraud and Market Manipulation.

128. Paragraphs 1 through 15 and 102 through 127 are realleged and incorporated by reference herein.

129. Bilzerian, directly or indirectly, in connection with the purchase and sale of the securities of Hammermill, by use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, employed devices', schemes or artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

130. As set forth in paragraphs 103 through 127 above, Bilzerian knew or was reckless in not knowing that the Schedule 13D/14D-1 that he caused HPC and Associates to file with respect to the securities of Hammermill contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under

which they were made, not misleading and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchases and sellers of such securities.

131. In addition to the foregoing, Bilzerian lied to the staff of the Commission while he was under oath and sworn to tell the truth in investigative testimony concerning the existence and nature of these contracts, arrangements and understandings concerning Hammermill.

### Bilzerian's Market Manipulation

132. On or about May 7, 1986, Bilzerian began negotiating with a certain institutional money manager ("the Manager") that controlled a substantial block of Hammermill common stock for the purchase of all or part of the Manager's block. Among the proposals that Bilzerian made was to acquire a portion of the block in the near future at the prevailing market price and to obtain an option to purchase the remaining portion of the block at a higher price.

133. On Thursday, May 8, 1986, Bilzerian sold 60,000 shares of Hammermill common stock under his control into the market. These sales constituted approximately 11% of the total activity in Hammermill for that day. Hammermill common stock traded at a high of $42 and a low of $39.25 on May 8, 1986.

134. On Friday, May 9, 1986, Bilzerian sold 177,700 shares of Hammermill common stock under his control into the market. These sales constituted approximately 26% of the total activity in

Hammermill for that day. Hammermill common stock traded at a high of $44.875 and a low of $42.125 on May 9, 1986.

135. On Monday, May 12, 1986, Bilzerian sold 125,000 shares of Hammermill common stock under his control into the market. These sales constituted approximately 44% of the total activity in Hammermill for that day. Hammermill common stock traded at a high of $43.875 and a low of $42.50 on May 12, 1986.

136. On Monday, May 12, 1985, Hammermill common stock closed at $42.75, which was one point lower than the close on Friday, May 9, 1985.

137. The sales of Hammermill common stock on May 8, 9 and 12 were undertaken at Bilzerian's direction for the purpose of depressing the price of Hammermill common stock in order to induce the Manager to sell all or part of the block of Hammermill under the Manager's control to Bilzerian at the then prevailing market price.

138. Bilzerian's manipulation of the price of Hammermill common stock was knowing or reckless and was a device, scheme or artifice to defraud, involved the making of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or was an act, practice or course of business which operated as a fraud or deceit in connection with the purchase or sale of Hammermill common stock.

139. The series of transactions in Hammermill common stock on May 12, 1986 were undertaken at Bilzerian's direction for the

41

purpose of, and with the effect of, creating actual or apparent active trading in Hammermill common stock and depressing the price of Hammermill common stock for the purpose of inducing the Manager to sell all or part of the Hammermill block under its control to Bilzerian.

140. By reason of the foregoing, Bilzerian, HPC and Associates violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

FOURTH CLAIM - HAMMERMILL

Bilzerian, HPC and Associates Violated Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e)--Tender Offer Fraud

141. Paragraphs 1 through 15 and 102 through 140 are realleged and incorporated by reference herein.

142. As detailed above, Bilzerian, directly or indirectly, in connection with a tender offer or request or invitation for tenders of Hammermill securities, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in fraudulent, deceptive and manipulative acts and practices.

143. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 13D/14D-1 with respect to the securities of Hammermill that he caused HPC and Associates to file contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated

42

and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

144. By reason of the foregoing, Bilzerian, HPC and Associates violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)].

### FIFTH CLAIM - HAMMERMILL

Bilzerian Violated Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2)--Market Manipulation

145. Paragraphs 1 through 15 and 102 through 144 are realleged and incorporated by reference herein.

146. The series of transactions in Hammermill common stock on May 12, 1986, which are described in paragraphs 133 through 140 above, were undertaken at Bilzerian's direction for the purpose of, and with the effect of, creating actual or apparent active trading in Hammermill common stock for the purpose of inducing the Manager to sell all or part of the Hammermill block under its control.

147. Bilzerian, directly or indirectly, by the use of the mails or means or instrumentalities of interstate commerce, or a facility of any national securities exchange, effected, alone or with one or more persons, a series of transactions in Hammermill securities creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

148. By reason of the foregoing, Bilzerian violated Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

43

## SIXTH CLAIM - HAMMERMILL

> Bilzerian Aided and Abetted Jefferies & Company's
> Violations of Section 17(a)(1) of the Exchange Act, 15
> U.S.C. § 78q(a)(1), and Rule 17a-3 Thereunder, 17
> C.F.R. § 240.17a-3--False Books and Records

149.   Paragraphs 1 through 15 and 102 through 148 are realleged and incorporated by reference herein.

150.   Jefferies & Company, as a registered broker-dealer, must make and keep such records as the Commission by rule proscribes as necessary and appropriate in the public interest or for the protection of investors, including accurately identifying, among other things, the account for which each transaction is made and the true beneficial owner of each security.

151.   Jefferies & Company, as a result of the secret accumulation agreement with Bilzerian, failed to reflect accurately on its books and records, among other things, Bilzerian's beneficial ownership of the 551,000 Hammermill shares accumulated and held by the firm, in violation of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3, thereunder [17 C.F.R. § 240.17a-3].

152.   Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or involved violations of Section 17(a)(1) of the Exchange Act and Rule 17a-3, and substantially assisted in the commission of those violations.

153.   By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

44

## SEVENTH CLAIM - HAMMERMILL

Bilzerian Violated Section 7(f) of the Exchange Act, 15
U.S.C. § 78g(f), and Regulation X Thereunder, 12 C.F.R.
§ 224.1 et seq.--Margin Violations

154. Paragraphs 1 through 15 and 102 through 153 are realleged and incorporated by reference herein.

155. Pursuant to the arrangement described in paragraphs 115 through 122 above, Bilzerian caused credit to be extended and obtained, and received and enjoyed the beneficial use of a loan and extension of credit for the purpose of purchasing or carrying Hammermill securities in contravention of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

156. By reason of the foregoing, Bilzerian violated Section 7(f) of the Exchange Act [15 U.S.C. § 78g(f)] and Regulation X thereunder [12 C.F.R. § 224.1 et seq].

## EIGHTH CLAIM - HAMMERMILL

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 7(c) of the Exchange Act, 15
U.S.C. § 78g(c), and Regulation T Thereunder, 12 C.F.R.
§ 220.1 et seq.--Margin Violations

157. Paragraphs 1 through 15 and 102 through 156 are realleged and incorporated by reference herein.

158. Pursuant to the arrangement described in paragraphs 115 through 122 above, Jefferies & Company, directly or indirectly, extended and maintained credit and arranged for the extension and maintenance of credit to Bilzerian for the purchase of Hammermill securities, in violation of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

45

159.  By virtue of its unlawful extension of credit to Bilzerian, Jefferies & Company violated Section 7(c) of the Securities Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

160.  Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or involved violations of Section 7(c) of the Exchange Act and Regulation T, and substantially assisted in the commission of those violations.

161.  By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

### NINTH CLAIM - HAMMERMILL

Tallant Aided and Abetted Bilzerian's Violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e), and Rules 10b-5, 13d-1, 14d-3 and 14d-6 Thereunder, 17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2, 240.14d-3 and 240.14d-6--Aiding and Abetting Securities Fraud

162.  Paragraphs 1 through 15 and 102 through 161 are realleged and incorporated herein by reference.

163.  Tallant facilitated Bilzerian's fraudulent scheme by serving as the trustee of the Tallant Trusts, which were instruments used to funnel funds to Bilzerian for the purpose of acquiring Hammermill securities while, at the same time, concealing the identities of the Hammermill Investors and the true terms of their investments.

164.  Tallant further facilitated Bilzerian's fraudulent scheme by, on at least one occasion, providing oral assurances to

one Hammermill Investor that--contrary to the language of the trust agreement between the Hammermill Investor and Tallant--the Hammermill Investor's trust contribution would be used by Bilzerian to buy a specific security, that the Hammermill Investor's trust contribution was guaranteed by Bilzerian to be returned, and that the Hammermill Investor would share evenly with Bilzerian the profits, if any, earned on the securities purchased with the investor's trust contribution.

165. Tallant knew or was reckless in not knowing of Bilzerian's violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78n(d), and 78n(e)] and Rules 10b-5, 13d-1, 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.14d-3 and 240.14d-6], and, by secretly funneling money from the Hammermill Investors to Bilzerian through the Tallant Trust, substantially assisted in the commission of those violations.

166. By reason of the foregoing, Tallant aided and abetted Bilzerian's violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e)] and Rules 10b-5, 13d-1, 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.14d-3 and 240.14d-6].

47

## TENTH CLAIM – HAMMERMILL

DeBartolo, Sr. Aided and Abetted Bilzerian's
Violations of Sections 13(d), 14(d) and 14(e) of
the Exchange Act, 15 U.S.C. §§ 78m(d), 78n(d) and 78n(e),
and Rules 13d-1, 14d-3 and 14d-6 Thereunder, 17 C.F.R.
§§ 240.13d-1, 240.14d-3 and 240.14d-6.

167. Paragraphs 1 through 15, 102 through 114, 123 through 127, and 141 through 144 are realleged and incorporated by reference herein.

168. As set forth above, the Schedule 13D/14D-1 and the amendments thereto that Bilzerian caused to be filed with respect to Hammermill violated Sections 13(d), 14(d) and 14(e) of the Exchange Act and Rules 13d-1, 14d-3 and 14d-6 thereunder in that, among other things, they did not disclose the true source of funds used to acquire the Hammermill securities, the interest of the Hammermill Investors in Hammermill securities and the arrangements, agreements and understandings that Bilzerian had entered into with the Hammermill Investors.

169. DeBartolo, Sr. knew or was reckless in not knowing that the conduct engaged in by Bilzerian was unlawful and/or would involve violations of Sections 13(d), 14(d) and 14(e) of the Exchange Act and Rules 13d-1, 14d-3 and 14d-6 thereunder, and substantially assisted in the commission of those violations.

170. DeBartolo, Sr.'s investment in the Tallant Trust entitled him to receive the profits earned on 197,550 shares of Hammermill common stock, the amount that was purchased with his $8 million investment in the Tallant Trust. On July 25, 1986, the day

that Bilzerian caused the Schedule 13D/14D-1 to be filed, trading in Hammermill common stock closed at $53.75 per share.

171. On or about September 11, 1986, DeBartolo, Sr. received $11,760,000.00, which represented an illegal profit of $2,123,662 from the time Bilzerian filed the false and misleading Schedule 13D/14D-1.

172. By reason of the foregoing, DeBartolo, Sr., aided and abetted Bilzerian's violations of Sections 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78m(d), 78n(d) and 78n(e)] and Rules 13d-1, 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.13d-1, 240.14d-3, and 240.14d-6].

### ELEVENTH CLAIM - HAMMERMILL

Moses Violated Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and Rule 14e-3 Thereunder, 17 C.F.R. § 240.14e-3--Trading While in Possession of Material Nonpublic Information

173. Paragraphs 1 through 15 and 102 through 144 above are realleged and incorporated by reference herein.

174. Defendant Moses purchased 5,000 shares of Hammermill common stock of June 19, 1986 and another 5,000 shares of Hammermill common stock on June 20, 1986.

175. Moses purchased the Hammermill common stock discussed in paragraph 174 above on June 19 and 20, 1986 at a time when Bilzerian had taken a substantial step or substantial steps to commence a tender offer for Hammermill, while Moses was in possession of material information, to wit (a) that Bilzerian had formulated a plan to make a tender offer for all of the outstanding shares of Hammermill common stock; (b) that Bilzerian was

49

negotiating with investment bankers to obtain the financing for a tender offer for Hammermill, and (c) that Bilzerian was negotiating, as part of his tender offer plan, for the purchase of a substantial block of Hammermill common stock held by the Manager, relating to such tender offer which information Moses knew or had reason to know was nonpublic and which Moses knew or had reason to know had been acquired directly or indirectly from Bilzerian.

176.  On or about July 25, 1986, Moses sold the 10,000 shares of Hammermill common stock for a profit of approximately $129,375.

177.  By reason of the foregoing, Moses violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### III.

### H.H. ROBERTSON COMPANY

### FIRST CLAIM - ROBERTSON

Bilzerian Aided and Abetted Jefferies & Company's Violations of Section 17(a)(1) of the Exchange Act, 15 U.S.C. § 78q(a)(1), and Rule 17a-3 Thereunder, 17 C.F.R. § 240.17a-3--False Books and Records

178.  Paragraphs 1 through 15 are realleged and incorporated by reference herein.

179.  H.H. Robertson Company ("Robertson") is incorporated in Pennsylvania.  Robertson's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the New York and regional stock exchanges.

180.  In or about July 1985, Bilzerian asked Landy whether Jefferies & Company would purchase shares of Robertson common stock held by Bilzerian and hold them for thirty (30) days with

Case 1:89-cv-18541-RC4-RC Document 1285-5 Filed 06/28/90/25 Page 50 of 514 of 75

the understanding that Bilzerian would buy the stock back and would repay Jefferies & Company the cost of the stock, plus the firm's cost to carry the stock and commissions. Landy, with Jefferies' approval, agreed to enter into this agreement.

181. Pursuant to this understanding, on July 22, 1985 Bilzerian "sold" 58,000 shares of Robertson common stock to Jefferies & Company at a price of $30.50 per share.

182. During the first thirty days that Jefferies & Company held the Robertson stock for Bilzerian, the market price for Robertson common stock declined from approximately $30.50 per share on July 23, 1985 to approximately $27.00 per share on August 23, 1985.

183. From on or about August 22, 1985, until on or about October 15, 1985, Bilzerian assured various Jefferies & Company employees that the firm would be protected against loss as a result of carrying the Robertson stock for him. Bilzerian, however, did not repurchase the 58,000 shares as he had promised to do.

184. On October 15, 1985, Jefferies & Company sold the 58,000 Robertson shares that were held for Bilzerian. Jefferies & Company realized a loss of approximately $250,000 on this sale.

185. From on or about October 15, 1985 to on or about December 24, 1985, another customer of Jefferies & Company, who had introduced Bilzerian to Landy (hereinafter referred to as "the Customer"), generated approximately $125,000 in securities commissions at Jefferies & Company that were intended to

Case 1:89-cr-00541-RSL-RC Document 1285-5 Filed 06/29/25 Page 52 of 75

compensate Jefferies & Company for a portion of the loss the firm sustained in selling Bilzerian's Robertson position. Jefferies & Company used this commission income to offset a portion of the losses that it had sustained as a result of selling Bilzerian's Robertson stock.

186. On or about December 24, 1985, at Jefferies & Company's urging, Bilzerian paid Jefferies & Company $125,000 to compensate the firm for the remainder of the loss that it had sustained in connection with Bilzerian's Robertson position. This payment was made with the understanding that the $125,000 would be refunded to Bilzerian if he and/or the Customer provided business to Jefferies & Company sufficient to generate commission charges to repay the remaining loss.

187. On or about December 24, 1985, in an attempt to conceal the purpose of the $125,000 payment discussed in paragraph 186 above, Bilzerian and Jefferies & Company agreed that Jefferies & Company would send Bilzerian an invoice for supposed "financial services" provided by it in connection with Bilzerian's threatened takeover of Cluett. In fact, Jefferies & Company did not provide any such services, and the invoice that Jefferies & Company sent was false and fictitious.

188. On or about February 14, 1986, Jefferies & Company repaid Bilzerian $75,000 of the money that he had paid the firm to cover the Robertson loss. In an attempt to conceal the purpose of this payment, Bilzerian prepared and sent to Jefferies & Company an invoice in the amount of $75,000 for supposed "consulting services"

provided by Bilzerian.  In fact, Bilzerian did not provide any such services, and the invoice that he prepared and sent to Jefferies & Company was false and fictitious.

189.  On or about March 10, 1986, in an attempt to obtain repayment of the remaining funds that he had paid to Jefferies & Company to cover the Robertson loss, Bilzerian prepared and sent to Jefferies & Company another false and fictitious invoice in the amount of $75,000.  This invoice fraudulently charged Jefferies & Company for consulting services rendered by Bilzerian, when in fact Bilzerian never rendered any consulting services to Jefferies & Company.  Bilzerian used the false and fictitious invoice as a vehicle to conceal the terms of his illegal agreement.

190.  Jefferies & Company, as a registered broker-dealer, must make and keep such records as the Commission by rule proscribes as necessary and appropriate in the public interest or for the protection of investors, including accurately identifying, among other things, the account for which each transaction is made and the true beneficial owner of each security.

191.  Jefferies & Company, as a result of the secret parking agreement with Bilzerian, failed to reflect accurately on its books and records, among other things, Bilzerian's beneficial ownership of the 58,000 Robertson shares held by the firm, in violation of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

192.  Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve

53

violations of Section 17(a)(1) of the Exchange Act and Rule 17a-3 thereunder, and substantially assisted in the commission of those violations.

193.  By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

### SECOND CLAIM - ROBERTSON

Bilzerian Violated Section 7(f) of the Exchange Act, 15 U.S.C. § 78g(f), and Regulation X Thereunder, 12 C.F.R. § 224.1 et seq.--Margin Violations

194.  Paragraphs 1 through 15 and 178 through 193 are realleged and incorporated by reference herein.

195.  Pursuant to the arrangement described in paragraphs 179 through 193 above, Bilzerian caused credit to be extended and obtained, and received and enjoyed the beneficial use of a loan and extension of credit for the purpose of purchasing or carrying Robertson securities in contravention of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

196.  By reason of the foregoing, Bilzerian violated Section 7(f) of the Exchange Act [15 U.S.C. § 78g(f)] and Regulation X thereunder [12 C.F.R. § 224.1 et seq.].

### THIRD CLAIM - ROBERTSON

Bilzerian Aided and Abetted Jefferies & Company's Violations of Section 7(c) of the Exchange Act, 15 U.S.C. § 78g(c), and Regulation T Thereunder, 12 C.F.R. § 220.1 et seq.--Margin Violations

197.  Paragraphs 1 through 15 and 178 through 196 are realleged and incorporated by reference herein.

54

198.  Pursuant to the arrangement described in paragraphs 179 through 193 above, Jefferies & Company, directly or indirectly, extended and maintained credit, and arranged for the extension and maintenance of credit to Bilzerian for the purchase of Robertson securities in violation of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

199.  By virtue of its unlawful extension of credit to Bilzerian, Jefferies & Company violated Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

200.  Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve violations of Section 7(c) of the Exchange Act and Regulation T, and substantially assisted in the commission of those violations.

201.  By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

IV.

ARMCO INCORPORATED

FIRST CLAIM - ARMCO

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 17(a)(1) of the
Exchange Act, 15 U.S.C. § 78q(a)(1), and
Rule 17a-3 Thereunder, 17 C.F.R.
§§ 240.17a-3--False Books and Records

202.  Paragraphs 1 through 15 are realleged and incorporated by reference herein.

55

203.    Armco Incorporated ("Armco") is incorporated in Ohio. Armco's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the New York and regional stock exchanges.

204.    On or about September 1, 1986, Bilzerian asked Landy if Jefferies & Company would buy 306,600 shares of Armco common stock and hold them thirty (30) days with the understanding that Bilzerian would buy them back and pay Jefferies & Company the cost of the stock, plus the firm's cost to carry the stock and commissions.  Landy, with Jefferies approval, agreed to enter into this arrangement.

205.    Pursuant to this arrangement, on September 2, 1986 Bilzerian "sold" 306,600 shares of Armco common stock to Jefferies & Company at a price of $7.125 per share.

206.    On or about September 15, 1986, Bilzerian entered into a second arrangement with Landy pursuant to which Jefferies & Company would acquire additional shares of Armco common stock for Bilzerian's benefit.  Under this arrangement, Jefferies & Company would acquire Armco shares for Bilzerian, and at a later date Bilzerian would "buy" the shares from Jefferies & Company and pay the firm its cost to acquire the stock, plus its cost to carry the stock and commissions.

207.    Pursuant to this second arrangement, from September 15 through October 1, 1986, Jefferies & Company acquired 512,300 shares of Armco common stock for Bilzerian in a firm account.

56

208.   On October 2, 1986, pursuant to the arrangements described above, Jefferies & Company sold 818,900 shares of Armco common stock to Bilzerian.  At Bilzerian's request, the sale price was reported to have occurred at $8.00 per share, when in fact Bilzerian had agreed with Jefferies & Company that Bilzerian would pay $7.25 per share for the 818,900 shares.  The $7.25 price was intended to compensate Jefferies & Company for its cost to acquire the stock, its costs to carry the stock and its commissions.

209.   On or about November 1, 1986, Bilzerian sent Jefferies & Company a false and fictitious invoice purporting to seek payment of $583,625 for "consulting services" supposedly provided by Bilzerian.  Bilzerian had not performed any such services for Jefferies & Company.  The invoice was in fact a vehicle for concealing the transfer to Bilzerian of the $.75 per share profit that he was owed by Jefferies & Company pursuant to the illegal arrangements discussed in paragraphs 202 through 208 above.

210.   Jefferies & Company, as a registered broker-dealer, must make and keep such records as the Commission by rule proscribes as necessary and appropriate in the public interest or for the protection of investors, including accurately identifying, among other things, the account for which each transaction is made and the true beneficial owner of each security.

211.   Jefferies & Company, as a result of the secret arrangements with Bilzerian discussed in paragraphs 202 through 208 above, failed to reflect accurately on its books and records, among other things, Bilzerian's beneficial ownership of 818,900 Armco

57

shares held by the firm, in violation of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

212. Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve violations of Section 17(a)(1) and Rule 17a-3, and substantially assisted in the commission of those violations.

213. By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

### SECOND CLAIM - ARMCO

Bilzerian Violated Section 7(f) of the Exchange Act, 15 U.S.C. § 78g(f), and Regulation X Thereunder, 12 C.F.R. § 224.1 et seq.--Margin Violations

214. Paragraphs 1 through 15 and 202 through 213 are realleged and incorporated by reference herein.

215. Pursuant to the arrangements described in paragraphs 203 through 213 above, Bilzerian caused credit to be extended and obtained, and received and enjoyed the beneficial use of a loan and extension of credit for the purpose of purchasing or carrying Armco securities in contravention of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

216. By reason of the foregoing, Bilzerian violated Section 7(f) of the Exchange Act [15 U.S.C. § 78g(f)] and Regulation X thereunder [12 C.F.R. § 224.1 et seq.].

58

## THIRD CLAIM - ARMCO

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 7(c) of the Exchange Act, 15
U.S.C. § 78g(c), and Regulation T Thereunder, 12 C.F.R.
§ 220.1 et seq.--Margin Violations

217.  Paragraphs 1 through 15 and 202 through 216 are realleged and incorporated by reference herein.

218.  Pursuant to the arrangement described in paragraphs 203 through 213 above, Jefferies & Company, directly or indirectly, extended and maintained credit and arranged for the extension and maintenance of credit to Bilzerian for the purchase of Armco securities in violation of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

219.  By virtue of its unlawful extension of credit to Bilzerian, Jefferies & Company violated Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

220.  Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve violations of Section 7(c) of the Exchange Act and Regulation T, and substantially assisted in the commission of those violations.

221.  By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

59

PAY 'N PAK STORES, INC.

FIRST CLAIM - PAY 'N PAK

Bilzerian Violated Section 13(d) of the Exchange Act,
15 U.S.C. § 78m(d), and Rule 13d-1 Thereunder, 17 C.F.R.
§ 240.13d-1--False Statements on Schedule 13D

222.   Paragraphs 1 through 15 above are realleged and incorporated by reference herein.

223.   Pay 'N Pak Stores, Inc. ("PNP") is incorporated in the State of Washington.  PNP's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York and regional stock exchanges at all relevant times, until March 1988 when the company's shareholders approved a management-led buyout.

224.   On March 26, 1987, Bilzerian and BiCoastal Financial Corporation ("BiCoastal"), a Florida corporation wholly-owned by Bilzerian, filed a Schedule 13D with the Commission with respect to PNP.  Bilzerian and BiCoastal filed amendments to the Schedule 13D on March 30, 1987 and thereafter.

225.   The March 26, 1987 Schedule 13D reported that Bilzerian and BiCoastal were the beneficial owners of 722,000 shares of PNP common stock.  The Schedule 13D further represented that Bilzerian personally had acquired 583,300 of these shares at a cost of approximately $6,596,800.  The Schedule 13D reported that approximately one-half of this purchase price was paid through ordinary margin loans and that the remainder of funds were obtained from Bilzerian's "personal funds."

60

226.  On or about November 24, 1986, Bilzerian obtained $3.75 million from a partnership controlled by an individual investor ("the PNP Investor").  Bilzerian obtained these funds for the purpose of acquiring PNP securities or in order to pay for PNP securities he already had acquired.

227.  Bilzerian entered into contracts, arrangements and understandings with the PNP Investor pursuant to which: (a) Bilzerian agreed to share evenly with the PNP Investor the profits, if any, earned on the securities purchased with the funds that the PNP Investor provided; and (b) Bilzerian personally guaranteed that the PNP Investor would not lose money and that the funds the PNP Investor had provided would be returned.

228.  In an apparent attempt to conceal the identity and existence of the PNP Investor and the terms of the loan with Bilzerian, Bilzerian funneled the $3.75 million through a trust entered into between defendant Tallant and the PNP Investor.  The trust purported to provide Tallant with unrestricted investment authority.  In fact, Tallant arranged with Bilzerian to transfer immediately to Bilzerian all contributions made to the trusts with the individual investor.

229.  Neither the March 26, 1987 Schedule 13D nor any amendments thereto disclosed the contracts, arrangements and understandings between Bilzerian and the PNP Investor that are set forth in paragraphs 223 through 228 above.

230.  The Schedule 13D and the amendments thereto filed by Bilzerian and BiCoastal contained untrue statements of material

Case 1:89-18541 RS4-RC Document 1285-5 Filed 06/29/25 Page 61 of 75

61

fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 13(d), Rules 13d-1 and 13d-2 thereunder and Schedule 13D, including, among others, the following:

(a) the Schedule 13D failed to disclose that Bilzerian borrowed approximately $3.75 million of the total purchase price of the PNP common stock listed in the March 26, 1987 Schedule 13D and failed to describe the terms of the loan transactions and the names of the parties thereto (Schedule 13D, Item 3);

(b) the Schedule 13D falsely identified the source of all of the funds used by Bilzerian to acquire PNP securities as Bilzerian's personal funds;

(c) the Schedule 13D and the amendments thereto failed to disclose the contracts, arrangements, under- standings and relationships that Bilzerian had entered into with the PNP Investor pursuant to which the PNP Investor was entitled to one-half of the profits earned on the PNP securities purchased with the funds that the PNP Investor provided and pursuant to which the PNP Investor was personally guaranteed by Bilzerian not to lose money on the investment (Schedule 13D, Items 3, 5 and 6); and

(d) the Schedule 13D falsely stated that there were no contracts, arrangements, understandings or

relationships with respect to the PNP securities when the contracts, arrangements, understandings and relationships described in paragraphs 223 through 229 were in existence.

231. By reason of the foregoing, Bilzerian violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

### SECOND CLAIM - PAY 'N PAK

Bilzerian Violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 Thereunder, 17 C.F.R. § 240.10b-5--Securities Fraud

232. Paragraphs 1 through 15 and 222 through 231 are realleged and incorporated by reference herein.

233. Bilzerian, directly or indirectly, in connection with the purchase and sale of the securities of PNP, by use of the means or instrumentalities of interstate commerce, the mails, or facilities of a national securities exchange, employed devices, schemes or artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

234. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 13D and amendments thereto with respect to the securities of PNP that he filed and caused BiCoastal to file

contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading.

235. By reason of the foregoing, Bilzerian violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THE SINGER COMPANY

### FIRST CLAIM - SINGER

Bilzerian Violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-1 Thereunder, 17 C.F.R. § 240.13d-1--False Statements on Schedule 13D

236. Paragraphs 1 through 15 are realleged and incorporated by reference herein.

237. The Singer Company ("Singer") is incorporated in New Jersey. Singer's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York and regional stock exchanges at all relevant times.

238. On October 29, 1987, Bilzerian caused a Schedule 13D to be filed with the Commission with respect to Singer on behalf of Bilzerian Partners Limited Partnership 1 ("Partners"), a partnership whose sole general partners were Bilzerian and Bilzerian's wholly-owned entity, BiCoastal Acquisition Corporation.

239. The Schedule 13D reported that Partners were the beneficial owners of 2.1 million shares of Singer common stock. The Schedule 13D reported that approximately one-half of the

approximately $91 million cost of acquiring these shares was obtained from ordinary margin loans and that the other half was "obtained from the working capital of the Partnership which was derived from the capital contributions of the partners, which in turn were derived from their working capital or personal funds."

240. On November 2, 1987, Bilzerian caused the Singer Acquisition Company, a subsidiary of Partners, to file a Schedule 14D-1 with the Commission announcing a tender offer for all of the outstanding shares of Singer at $50 per share. Neither the Schedule 14D-1 nor any amendments thereto disclosed the contacts, arrangements or understandings set forth below.

241. On or about March 11, 1987, Bilzerian obtained $3.5 million from an individual investor ("the first Singer Investor"). Bilzerian obtained these funds for the purpose of acquiring Singer securities or paying for Singer securities he already had acquired.

242. In an apparent attempt to conceal the identity and existence of the first Singer Investor and the terms of the loan with Bilzerian, Bilzerian funneled the $3.5 million through a trust entered into between defendant Tallant and the first Singer Investor. The trust purported to provide Tallant with unrestricted investment authority. In fact, Tallant arranged with Bilzerian to transfer immediately to Bilzerian the contribution made to the trust by the first Singer Investor.

243. On or about October 21, 1987, Bilzerian obtained $4.5 million from a partnership controlled by an individual investor

("the second Singer Investor"). Bilzerian obtained these funds for the purpose of acquiring Singer securities or paying for Singer securities he already had acquired.

244. Bilzerian entered into contracts, arrangements and understandings with both of the Singer Investors pursuant to which: (a) Bilzerian agreed to share evenly with the Singer Investors the profits, if any, earned on the securities purchased with the funds the Singer Investors provided; and (b) Bilzerian personally guaranteed that the Singer Investors would not lose money and that the funds they had provided would be returned.

245. The Schedule 13D filed by Bilzerian and Partners did not disclose the contracts, arrangements and understandings between Bilzerian and the two Singer Investors that are set forth in paragraphs 237 through 244 above.

246. The Schedule 13D filed by the Partnership contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 13(d), Rule 13d-1 thereunder and Schedule 13D, including, among others, the following:

> (a)   the Schedule 13D failed to disclose that Bilzerian borrowed $8 million of the total purchase price of the Singer securities listed in the Schedule 13D and failed to describe the terms of the loan transactions and the names of the parties thereto (Schedule 13D, Item 3);

66

(b)    the Schedule 13D falsely identified the source of all of the funds used by Bilzerian to acquire Singer securities as personal funds or working capital;

(c)    the Schedule 13D failed to disclose the contracts, arrangements, understandings and relationships that Bilzerian had entered into with the Singer Investors pursuant to which the Singer Investors were entitled to one-half of the profits earned on the Singer securities purchased with the funds that they provided and were personally guaranteed by Bilzerian not to lose money on their investments (Schedule 13D, Items 3, 5 and 6); and

(d)    the Schedule 13D falsely stated that there were no contracts, arrangements, understandings or relationships with respect to the Singer securities when the contracts, arrangements, understandings and relationships described in paragraphs 237 through 244 were in existence.

247.   By reason of the foregoing, Bilzerian violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

the arrangement, agreement or understanding between Bilzerian and the first Singer Investor set forth above.

253. By reason of the foregoing, Bilzerian violated Section 14(d) of the Exchange Act [15 U.S.C. § 78n(d)] and Rules 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.14d-3 and 240.14d-6].

## FORTUNE FINANCIAL GROUP, INC.

### FIRST CLAIM - FORTUNE

Bilzerian Violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-1 Thereunder, 17 C.F.R. § 240.13d-1--Failure To Disclose Timely Beneficial Ownership on Schedule 13D

254. Paragraphs 1 through 15 are realleged and incorporated by reference herein.

255. Fortune Financial Group Incorporated ("Fortune") is incorporated in Florida. Fortune's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded through the National Association of Securities Dealers, Inc. Automated Quotation System ("NASDAQ") as a National Market System stock.

256. On or about February 26, 1988, at the latest, Bilzerian became, directly or indirectly, the beneficial owner of in excess of five percent of the outstanding common stock of Fortune.

257. Section 13(d) of the Exchange Act and Rule 13d-1 thereunder require any person to file with the Commission a Statement on Schedule 13D describing the nature and extent of their securities holdings no later than ten days after they become the beneficial owners of in excess of five percent of a class of registered securities.

258.  On May 3, 1988, Bilzerian filed with the Commission for the first time a Schedule 13D with respect to Fortune.  The Schedule 13D reported that Bilzerian and Bilzerian Partners Limited Partnership Series B ("Partners") were the beneficial owners of 282,00 shares of Fortune common stock, which represented approximately 6.25% of the total outstanding common stock of Fortune.

259.  Bilzerian filed the Schedule 13D with the Commission more than ten days after Bilzerian and Partners became the beneficial owners of in excess of five percent of the outstanding common stock of Fortune, which was on March 8, 1988 at the latest.

260.  On or about April 21, 1988, Bilzerian purchased 50,000 shares of Fortune common stock at a cost of $18.25 per share.  On or about April 27, 1988, Bilzerian purchased another 5,000 shares of Fortune common stock at a cost of $19.25 per share.  When Bilzerian made these purchases he secretly had been, directly or indirectly, the beneficial owner of in excess of five percent of the outstanding common stock of Fortune for more than ten days. On May 3, 1988, the day that Bilzerian belatedly filed his initial Schedule 13D, Fortune common stock closed at $24 per share, up $4.75 points from the close of $19.25 on May 2, 1988.  Thus, Bilzerian realized an illegal savings of at least $318,125 by virtue of his failure to file timely a Schedule 13D.

261.  By reason of the foregoing, Bilzerian violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

Case Case 1:89-cv-18541-RSL-RCL Document 1285-5 Filed 06/28/29/25 Page 69 of 70 4 of 75

70

## SECOND CLAIM - FORTUNE

Bilzerian Violated Section 10(b) of the Exchange Act,
15 U.S.C. § 78j(b), and Rule 10b-5 Thereunder, 17 C.F.R.
§ 240.10b-5--Securities Fraud

262. Paragraphs 1 through 15 and 254 through 261 are realleged and incorporated by reference herein.

263. Bilzerian, directly or indirectly, in connection with the purchase and sale of the securities of Fortune, by use of the means or instrumentalities of interstate commerce, the mails, or facilities of a national securities exchange, employed devices, schemes or artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

264. On or about January 18, 1988, Bilzerian spoke with an officer of Fortune. During this conversation, Bilzerian was informed that the number of shares of Fortune common stock that he represented that he owned constituted in excess of five percent of the total number of shares of Fortune common stock then outstanding.

265. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 13D with respect to the securities of Fortune that he caused the Partnership to file contained untrue statements of material fact and omissions of material facts

71

necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading.

266.  By reason of the foregoing, Bilzerian violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

I.

Grant permanent injunctions restraining and enjoining defendants Bilzerian and Tallant, and their officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

II.

Grant permanent injunctions restraining and enjoining defendants Bilzerian and Tallant, and their officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78m(d); 17 C.F.R. §§ 240.13d-1 and 240.13d-2].

72

III.

Grant permanent injunctions restraining and enjoining defendants Bilzerian and Tallant, and their officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 14(d) of the Exchange Act and Rules 14d-3 and 14d-6 promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78n(d); 17 C.F.R. §§ 240.14d-3 and 240.14d-6].

IV.

Grant permanent injunctions restraining and enjoining defendants Bilzerian and Tallant, and their officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 14(e) of the Exchange Act, and from aiding and abetting such violations [15 U.S.C. § 78n(e)].

V.

Grant a permanent injunction restraining and enjoining defendant Bilzerian, and his officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 7(c) of the Exchange Act and Regulation T promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78g(c); 12 C.F.R. §§ 220.1 et seq.].

73

## VI.

Grant a permanent injunction restraining and enjoining defendant Bilzerian, and his officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 7(f) of the Exchange Act and Regulation X promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78g(f); 12 C.F.R. § 224.1 et seq].

## VII.

Grant a permanent injunction restraining and enjoining defendant Bilzerian, and his officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 17(a) of the Exchange Act and Rule 17a-3 promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78q(a); 17 C.F.R. § 240.17a-3].

## VIII.

Grant a permanent injunction restraining and enjoining defendant Bilzerian, and his officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 9(a)(2) of the Exchange Act, and from aiding and abetting such violations [15 U.S.C. § 78i(a)(2)].

74

## IX.

Grant permanent injunctions restraining and enjoining defendants DeBartolo, Sr., Moses and Sokolov, and their officers, agents, servants, employees, attorneys-in-fact, and those persons associated with them from violating, directly or indirectly, Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e)] and Rules 10b-5, 13d-1, 13d-2, 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2, 240.14d-3 and 240.14d-6], and as to defendant Moses only, Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3] and from aiding and abetting such violations.

## X.

Enter an Order requiring the defendants, and each of them, to account for and disgorge all profits and monies received and losses avoided as a result of their illegal conduct as alleged by the Commission herein.

## XI.

Enter an Order requiring defendant Moses to pay civil penalties under the Insider Trading Sanctions Act of 1984, 15 U.S.C. § 78u(d)(2)(a), in the amount of $129,325.00 from his trading in Hammermill common stock, as described herein.

75

## XII.

Grant all further relief, legal or equitable, that the Court believes is warranted under the circumstances.

Respectfully Submitted,

Gary Lynch

William R. McLucas

Thomas C. Newkirk

Bruce A. Hiler

Barry R. Goldsmith

Jay A. Dubow

Herbert F. Janick III

Catherine M. Shea

Attorneys for Plaintiff
Securities and Exchange
  Commission
450 Fifth Street, N.W.
Mail Stop 4-5
Washington, D.C. 20549
(202) 272-2945

Dated: June 29, 1989